Fred DRUCKER and Jacqueline A. Drucker, Plaintiffs,

v.

O'BRIEN'S MOVING AND STORAGE INC., Bekins Van Lines Co., et al., Defendants.

No. CV-N-88-487 BRT.

United States District Court, D. Nevada.

June 28, 1990.

Stephen N. Scheerer, Incline Village, Nev., for plaintiffs.

Ellen Jean Winograd, Laxalt & Nomura, Reno, Nev., for defendants.

BRUCE R. THOMPSON, District Judge.

Counsel have concluded their arguments and I think we've all spent enough time on this case, so I'm going to try to decide it. It is a unique case in many respects.

The preponderance of the evidence shows that the plaintiffs owned the 1931 Estey Baby Grand piano and that it was completely reconstructed and refurbished in the Bay area by Stone Piano Company and Schmalz & Nelson. It was moved from place to place by the A-1 Piano Movers, and then ultimately stored by the A-1 Piano Movers before it was transported to Incline, Nevada.

Sometime early in December, 1987, the plaintiffs arranged to have the piano transported from A-1 Piano Movers to their residence at Incline, Nevada, and made that arrangement with the defendant O'Brien's Moving and Storage Inc., which was acting as an agent for Bekins Van Lines Company, the other defendant.

There is no evidence that the piano had suffered any damage whatsoever before it was loaded onto the Bekins truck on December 15th, 1987. The evidence is expressly to the contrary. This is an unusual case because there is direct specific evidence that the piano had been completely refurbished, completely reconstructed, and placed in A-1 condition, before it was picked up to be moved to Incline, Nevada.

The piano remained in the custody of O'Brien Moving and Storage Company from December 15th until January 6th— twenty-two days. We have no explanation whatsoever of where it was or what happened to it during that twenty-two day period. It is almost enough time to have shipped it around the Horn. We don't know where it was. We don't know whether it was removed from the truck and reinstalled in the truck, whether any physical damage had been done to it, whether it had fallen. We don't have any idea what occurred with respect to the piano between December 15th and January 6th.

It is, nevertheless, the law that that was bailment for hire and under the law pertaining to motor carriers they were responsible for any damage that occurred between the date they accepted the shipment on December 15th, and the delivery to the consignee or shipper on January 6th.

Now, the evidence in this case, has been somewhat distorted because almost everyone who has testified has been polarized by the fact that Mr. Drucker observed the delivery men drop the piano six inches or a foot or so at the bottom of the stairway into the Drucker residence, and that Mr. Drucker so asserted in the claim.

But it is not the law that you have to identify a specific event that resulted in the damage to the goods being transported under the carriage contract.

The law is that if the piano, in this case, was not delivered at Incline, Nevada in substantially the same condition that it was in when it was delivered to the custody of the carrier, the carrier is responsible.

That particular fact is recognized by Bekins in its manual. It states specifically that it is liable for damage or loss of goods in transit:

It is generally defined in the applicable tariffs and in contract terms and conditions of the uniform household goods bill of lading, the carrier has liability for cargo loss and/or damage to any article that occurs from external cause while the good are being transported and are stored in transit under Bekins' bill of lading.

Simply stated, this definition of liability refers to an item or items tendered to Bekins for transport, and not returned, or returned in a condition different from that when tendered for shipment.

In connection with the discussion of good faith of Bekins in negotiating a settlement of the claim, this issue becomes important.

The question before the court is what was the damage to the piano at the time it was delivered to the Drucker residence on January 6th, 1988?

■ The preponderance of the evidence shows, from the testimony of Mr. Remneff and the testimony of Mr. Stone, and even in part from the testimony of Mr. Warren, that there was more than external damage to this piano, and that the cost of restoring that piano to the condition it was in at the time it was delivered to Bekins, or O'Brien's for shipment, exceeds its fair market value.

It is therefore clear that under the terms of the bill of lading, the plaintiffs are entitled to recover from both defendants, jointly and severally, that is, O'Brien's Moving and Storage Inc. and Bekins Van Lines Company, the sum of six thousand four hundred and nineteen dollars and eighty-seven cents ($6,419.87) as the total loss incurred with respect to the damage to the piano. ($6,000 is the fair market value of the piano, and $419.87 is the amount paid by Drucker for excess coverage).

■ Because this was a total loss, this amounts to a purchase of the piano by O'Brien's Moving and Storage Company, but the plaintiffs don't have to store the piano for O'Brien's indefinitely; and so, O'Brien's Moving and Storage Company must, within thirty days from today, make arrangements to obtain possession of the piano from the plaintiffs and take it into their possession on payment of the sum of six thousand four hundred and nineteen dollars and eighty-seven cents ($6,419.87), plus interest on that amount at the federal rate in effect on March 18, 1988. The clerk will find out the rate from the clerk's office on that date.

■ Interest is computed on the basis that it was the policy of Bekins and O'Brien's to settle claims within thirty days. The claim was made on February 18th and so the claim should have been settled, for the purposes of computation of interest, on March 18th, 1988.

Upon payment of that total sum of six thousand four hundred and nineteen dollars and eighty-seven cents ($6,419.87), plus interest at the federal rate from March 18, 1988, O'Brien's or Bekins may obtain delivery of the piano.

My determination of value will become more understandable—or determination of loss—in the discussion of the implied covenant of good faith and fair dealing.

■ Contrary to the earlier opinion coming from this court in this case, I am convinced that in this particular case, where the entire liability of the shipper depends upon the terms and provisions of the bill of lading, and the contract, that there can be no state law claims for relief.

I am satisfied that the great weight of authority, perhaps unanimous authority, is to the effect that in these circumstances the plaintiffs are limited to the damages they can recover under the bill of lading. And this is because of the Carmack Amendment (49 U.S.C. § 11707) and the preemption of state law recognized by the courts under that amendment. But that does not necessarily foreclose consideration of further issues in the case.

These defendants entered into a contract of carriage with the plaintiffs, and provided to the plaintiffs what we might term self-insurance in the amount of seven thousand dollars ($7,000). Such a bill of lading is the same type of contract of adhesion that we have when a citizen enters into any form of

liability insurance policy with an insurance company.

Under the manual in this case, and the policies of Bekins, the plaintiffs had three options. They could accept the standard coverage for loss of sixty cents ($.60) per hundred weight, or they could enter into some additional contract with the carrier, Bekins, whereby they stated—gave a stated value to the goods to be transported—and paid a premium, like an insurance premium, for that additional protection. Or they could buy a policy of insurance, like any liability insurance policy from a third party which would indemnify them against loss in the event of any mishandling of the goods by the carrier.

In this instance, the plaintiffs elected the second course and paid an additional premium to obtain protection against damage or loss of the piano while it was in the custody of the carrier. Whether or not that protection should have been nine thousand dollars ($9,000) instead of seven thousand dollars ($7,000) is immaterial because of the preponderance of the evidence which shows that the fair market value of the piano at the time it was delivered to the carrier was approximately six thousand dollars.

■ Although this is a federal contract, covered by federal law, it nevertheless has the same implied covenant of good faith and fair dealing that inures in every contract.

Under this bill of lading and its terms and federal regulations, Bekins had a specific obligation to deal fairly and in good faith with the plaintiffs with respect to the claim for damages which Mr. Drucker made and documented.

■ In my view, this obligation does not differ in kind or quality from the same sort of obligation that an insurance carrier has. And this obligation under federal law is not hampered by the terms of any state statute that provides that punitive damages are not recoverable in a contract case, because we don't have any federal statute that says that punitive damages are not recoverable in a contract case. And there is no federal law to that effect.

What we attempt to do is analyze the evidence and determine whether a preponderance of the evidence shows that Bekins, in its handling of the claim, did so primarily for its own benefit, with little regard for the rights of the shipper, and whether it deliberately and intentionally ignored the information that the shipper gave to it bearing upon the just and fair settlement of the claim.

I think that the evidence in this case demonstrates that that was the attitude Bekins had about Mr. Drucker's claim for damages. In his initial letter, Mr. Drucker pointed out that he had had the piano thoroughly examined by an expert who had been recommended to him by O'Brien Moving and Storage. The fact of such recommendation was entirely ignored. It should have carried some weight.

Mr. Drucker, in his initial letter, included the entire report of Mr. Remneff—Mr. Peter Remneff—which concluded that the piano was a total loss. Not because of exterior damage to the piano, but because of interior damage to the piano.

Mr. Drucker pointed out that this piano had been completely reconditioned by Mr. Stone, and was presumably in A–1 condition at the time it was delivered to the carrier. All this was ignored.

The first thing that was done was that although the claim was for in excess of six thousand dollars, the claim was assigned to an adjuster who had settlement authority of seven hundred and fifty dollars ($750). But the manual provides that when the carrier liability is three hundred and one dollars ($301) to two thousand dollars ($2,000), the claim shall be assigned to an adjuster, but the adjuster only has negotiating authority for seven hundred and fifty dollars ($750).

So if the amount "claimed/apparent" liability is two thousand one dollars ($2,001) to four thousand dollars ($4,000), the claim is assigned to a senior adjuster who has negotiating authority only to the extent of two thousand dollars ($2,000).

And if the claim is over four thousand dollars ($4,000) it is assigned to a supervi-

sor, and his negotiating authority is limited by three thousand dollars ($3,000), which on its face indicates to me that the Bekins adjuster's department has no intention of approving any claim for the amount of the claim, whether it is fully supported by proper proof or not, but they are going to assign the claim to somebody who has to negotiate for an amount less than the claim.

This, of course, is more specifically borne out by Section 22 regarding the art of negotiating, which I may as well read because it is so astonishing to me:

For the most part claims adjusting is like any other business transaction in that it requires negotiation. In short, we proceed on the basis that everything is negotiable. Generally claimants tend to inflate their demands. That is, they ask for more than they really expect to receive.

A good adjuster understands this premise of human nature and routinely seeks to negotiate settlements which are less than the amount claimed.

The rule of thumb to follow is establish the carrier's maximum liability for a particular item or claim, and then negotiate a settlement for a lesser amount whenever possible.

Good negotiating skills are developed over time and with practice. They are an integral part of the adjusting process, and must be employed in every case. You may not always be successful in negotiating a lower settlement, but you should *always* attempt to. Your duty as an adjuster is to satisfy the claimant with the lowest possible expenditure.

To give you an idea of the impact aggressive negotiating can have, if you succeed in negotiating an average of fifty dollars off each claim you handle, you will save the company approximately fifty thousand dollars over the course of a year. If every adjuster in this department did the same, it would constitute an annual savings of one million dollars.

Think about it, and remember *everything* is negotiable.

(Emphasis in original).

In my way of thinking, that directive is the antithesis of the concept of good faith and fair dealing, the antithesis of any effort to recognize the rights of the shipper and to try to give him fair treatment. And the implementation of the policy demonstrated by this manual is shown by the evidence in this case.

As I have already remarked, Mr. Drucker hired a thoroughly qualified piano appraiser recommended by O'Brien's, and after obtaining his report sent a copy in to Bekins with his claim for some six thousand odd dollars.

The first thing that Bekins did was send out Mr. Andrews who made his inspection of the piano on February 3rd, 1988, and made a report in which he says: "Apparent evidence of physical damages done by movers only"—and he lists them. It says the damage is two hundred and fifty dollars ($250), and it indicates that his repair bill for that obvious physical damage would be two hundred and fifty dollars ($250). He then makes this very interesting note, quote: "There is no evidence of this piano having been dropped or abused in any way other than what is noted here. It is my belief that any other damages noted were preexisting or a result of the restoration. (I consulted a piano technician on this)."

I don't know whether Mr. Andrews knew that O'Brien had had this piano in their possession for twenty-two days, and nobody knows where, but there is no basis whatsoever for that sort of an opinion from him because of the cursory investigation he made. He doesn't indicate whether there were any other damages, and if there were, what they consisted of; he just indicates there might have been other damages. We don't know what.

· The next man, employed by Bekins, Mr. Daniels, was not any better qualified. As a matter of fact, he is wholly unqualified, as was Mr. Andrews, to inspect any internal damage to the piano. And he came up with a possible figure of five hundred dollars ($500) to repair the external damage.

After Bekins' offer of five hundred dollars ($500) to Mr. Drucker, which was rejected, Bekins got hold of Douglas Thomsky and Associates. Their first report is dated April 1, 1988. It says:

On the surface this claim appears straightforward and legitimate. Mr. Drucker reportedly invested three thousand five hundred and fifty dollars ($3,550) to have a 1931 vintage baby grand piano completely reconditioned and refinished shortly before pick up by Bekins. The six thousand to nine thousand indicated, is cost of a brand new piano of similar size and quality, [and] is accurate. The difficulty/controversy arises in trying to determine the extent of potential carrier liability.

Then he says: "On the other hand, your delivery man reports that the piano was not dropped or jarred, and explains exactly how the keyboard and case were damaged." Well, if that is a proper interpretation of Mr. Bukonowski's [phonetic] report —well, it is his interpretation.

It says: "Andrews' service report and two hundred and fifty dollar ($250) estimate for repairs seems to confirm that the Estey Baby Grand suffered rather minor external damage."

The supplemental note to Mr. Andrews' report is interesting. He states his opinion that: "Any other damages noted were preexisting or a result of the restoration" and adds that he consulted with a piano technician.

Now why any insurance adjuster—or claims adjuster having the purported experience of Douglas Thomsky—would place any reliance whatsoever on what Mr. Andrews added as a footnote to his report respecting cause, is beyond belief. Mr. Thomsky states:

At this point I cannot provide you with a defensible basis for tendering settlement. However, for whatever it is worth, I surmise from Mr. Remneff's inspection report and the tender of the follow-up letter of February 18th to O'Brien's Moving and Storage, that his conclusions regarding Bekins' liability are prejudicial.

I don't know what he means by "prejudicial." I continue the quotation:

While the damages and mechanical problems which Mr. Remneff observed are doubtless valid, I believe that his conclusions regarding their origin were heavily weighted by hearsay.

If he were acting independently as a disinterested third party, I see no reason why a discussion with Sid Stone, the gentleman who reconditioned the piano movement, was needed.

The claims manual of Bekins, page nine, section two, carrier liability, states: "(1) to determine whether the damage or loss reported by the customers incurred during transit or storage in transit."

It should be apparent to a kindergarten student, in view of the claim information presented by Mr. Drucker, that it was very appropriate to interview Mr. Stone to try to find out whether there was any internal damage or vice, as Mr. Scheerer likes to say, with respect to the piano, before it was delivered into the custody of the carrier.

Then Mr. Thomsky also makes this surprising observation: "Finally, I am surprised that Mr. Remneff would share his opinion with Clayman, as he was reportedly assigned by your agent."

Well, of course, that is not true in any respect. He was recommended by Mrs. Knight. He was employed and paid by Mr. Drucker.

In the meantime, Mr. Drucker had rejected the five hundred dollar ($500) offer, and referred everybody back to Mr. Remneff's report. So they got Mr. Warren to go out and look at it. He says he could see no evidence of transit damage. He doesn't say he couldn't see any evidence of damage. He talks about the sound board, which was important to Mr. Remneff. He says, quote: "From this we would conclude that this is definitely not new damage."

Well, we had the testimony of Mr. Stone who stated that the piano had been completely reconditioned in A–1 shape. Mr. Warren acknowledges that the workmanship of Mr. Stone appears quite good. But he believes that any transit damage that

would affect the tuning pins or the plate would destroy the exterior of the piano. He says the quality of the refinishing is also excellent. Then he says this: "In my opinion, in transit damage to this piano limited solely to the external furniture." And he attempts to reconstruct the character of the drop or the fall that caused the exterior damage to the piano.

And he, like everybody else in this case, has completely ignored what may have happened to the piano while it was in the custody of O'Brien's for twenty-two days. And has completely ignored O'Brien's obligation to deliver the piano at Incline, Nevada, in the same condition in which it was when it was delivered to O'Brien's by A–1 Piano Moving Company.

And, as emphasized by Mr. Scheerer, Mr. Warren didn't give any estimate whatsoever of the damages he saw to the piano, because he wasn't requested to.

Now Mr. Thomsky comes into the act again, after he got Mr. Warren's report. He strongly recommended that a complete copy of Mr. Warren's report be forwarded to Mr. Drucker, which of course was not done by Bekins. They didn't even follow the advice of their own adjuster expert. And Mr. Thomsky says: "It appears that the carrier's liability is limited to correcting the obvious external case and ivory key damages which occurred during delivery of this piano, as the internal problems which Mr. Warren located cannot be related to mishandling while in transit, or external trauma." Of course he doesn't refer to the internal damage that Mr. Remneff located.

And I repeat, nobody can tell us what happened to the piano. Nobody can tell us whether there was an external trauma that was responsible for everything that many people found was wrong with this piano.

And then Mr. Buti elected to write Mr. Drucker—write a letter, in which he says that the inspector that was sent out to inspect the damage to the piano states it will cost no more than five hundred dollars to repair the external transit damage. He didn't state any such thing. And he says his report is attached, and it was not attached.

And it is an indication of bad faith that the carrier, Bekins, did not supply Mr. Drucker with any of its information regarding claims settlement. All it did was state what it thought was beneficial to Bekins, and excluded the reports and information.

Then we get a letter from Mr. Scott Mickelson, who is the manager of claims for Bekins, on August 31, 1988, in which he acknowledged a telephone call from Mr. Steve Scheerer. It states: "A review of the entire file indicates that in order for us to consider any type of negotiation with your attorney, we require that he forward to us a letter—a letter stating that he is representing you. Without this letter I cannot deal with him."

Now, all that is, is another stall, because they already had a letter. The first letter—or second, I don't remember which—that Mr. Drucker wrote to Bekins. Mr. Drucker told them he was represented by Mr. Steve Scheerer.

In view of all the evidence in this case, it is my view that Bekins Storage Transit Company deliberately and intentionally refused to consider the claim of Mr. Fred Drucker in good faith. And deliberately and intentionally determined that they would not offer more than five hundred dollars in settlement of his genuine claim for over six thousand dollars.

We are dealing with a contract that is governed by federal law. There is nothing in the Carmack Amendment that rejects the allowance of punitive damages. As a matter of fact, the Carmack Amendment expressly states, as Mr. Scheerer pointed out, that there are other rights and remedies that are not precluded. The courts have held that state law remedies cannot be enforced, and are preempted by the Carmack Amendment.

But we can have a form of federal common law, which is applicable in this case. The Supreme Court case of *Clearfield Trust Company v. the United States*, 318 U.S. 363 and 367, 63 S.Ct. 573, 87 L.Ed. 838 (1943), discusses the concept of federal common law. That discussion was summarized by the Judge in *Southern Pacific*

*Transportation Company v. the United States,* 462 F.Supp. 1193, at page 1201 (1978), in the Eastern District of California, as follows:

> If the rights and duties of the parties derives sufficiently from a federal source—then federal law may be held to govern aspects of the case on which no specific constitutional or federal statutory provision provides the rule of decision.

> Upon concluding that federal common law is to govern, the court must then determine whether that law is to be a uniform federal common law or whether the federal rule is to be incorporated from state law. The first decision may be termed the preemption decision, and the second the adoption decision.

In this case it is important that the rules should be uniform throughout the United States, with respect to what relief may be obtained for violation of the terms and provisions of a bill of lading governed by the Carmack Amendment, and for the carrier's established bad faith conduct in connection with the consideration and settlement of the shipper's claims.

There is nothing in the Carmack Amendment that precludes punitive damages. In this particular case it is clear from the evidence that O'Brien Moving and Storage Company had no significant participation in the investigation and consideration of a settlement of the claims made.

But it is obvious to the court, from the evidence, that Bekins Van Lines Company conducted its negotiations solely for its own benefit, without any consideration of the rights of the claimants, and with the deliberate design and intention to refuse to acknowledge the validity of a just claim.

Accordingly, the court finds that punitive damages should be assessed against Bekins Van Lines Company in the sum of ten thousand dollars ($10,000).