Donald L. CLEVELAND; Christa A. Cleveland, Plaintiffs–Appellees,

v.

BELTMAN NORTH AMERICAN CO., INC.; N. American Van Lines, Defendants–Appellants.

No. 583, Docket 93–7516.

United States Court of Appeals, Second Circuit.

Argued Nov. 8, 1993.

Decided July 27, 1994.

William J. Dreyer, Albany, NY (Daniel J. Stewart, Dreyer, Boyajian & Tuttle, of counsel), for defendants-appellants Beltman

North American Co., Inc.; N. American Van Lines.

Kenneth L. Ayers, West Coxsackie, NY (Law Offices of Kenneth L. Ayers, of counsel), for plaintiffs-appellees Donald L. Cleveland and Christa A. Cleveland.

George W. Wright, Newark, NJ (Kroll & Tract, of counsel), filed an amicus curiae brief for American Movers Conference.

Before: CARDAMONE, JACOBS and GOODWIN, * Circuit Judges

CARDAMONE, Circuit Judge:

This appeal brings before us a married couple whose household belongings, after being transported by movers from Iowa to New York, were found upon arrival to be badly damaged. When claims made against the moving company to obtain compensation proved unavailing, the instant litigation was commenced. In handling plaintiffs' claims, the moving company—in a deliberate and determined effort to frustrate plaintiffs' collection of damages for their losses—was guilty of foot-dragging and stonewalling. It did not deal fairly or in good faith with the couple.

▪ Ordinarily, common law principles of equity leaven the law, softening its rigors so that the law's aim of administering justice fairly is not lost. But on occasion, and this is one, the equities urge a course that the law may not take. Here, a hope that conduct such as that shown by the moving company could result in an award beyond compensatory damages is doomed to disappointment. We must reckon with an area of interstate commerce law that has been fully occupied by Congress' passage of a statute delineating what remedies are available, leaving no room for additional state or federal common law causes of action.

## BACKGROUND

### Plaintiffs' Move to New York

In August 1988 Donald and Christa Cleveland moved from West Des Moines, Iowa to Slingerlands, New York, a suburb of Albany. To prepare for the move, the Clevelands searched for a reputable moving company to carry their household goods and personal belongings. In a decision they have no doubt come to regret, they hired defendant North American Van Lines (North American) and North American's local agent in Des Moines, defendant Beltman North American Co., Inc. (Beltman). North American and Beltman (defendants) are common carriers as that term is defined by the Interstate Commerce Act, 49 U.S.C. § 10102(4) (1988).

Following the usual practice, the Clevelands, North American, and Beltman executed a shipping contract, commonly called a bill of lading. Under a standard bill of lading carriers are responsible for only 60 cents per pound for damaged items. Having recently purchased new furniture, the Clevelands worried whether this reimbursement rate would adequately cover a loss they might incur were their belongings to be accidentally damaged or lost. Because of this concern, they purchased supplemental protection from the moving company at an additional cost of $320. The protection plan, which was incorporated into the bill of lading, provided for the repair, replacement or 100 percent reimbursement at current prices without depreciation for any goods damaged or lost during transport for a sum up to $50,000.

Beltman loaded the Clevelands' possessions into its van on August 19, 1988. When the driver who was scheduled to drive the van to New York State was unable to do so on account of family illness, the trailer with the Clevelands' household goods was separated from its tractor and taken to Beltman's lot in Des Moines to await another driver. After several days a new driver was found, but as a result of this change the Clevelands' belongings were reloaded onto a different van. Since it was North American's policy to require that blankets and other packing materials utilized by the initial loaders remain with the original van, upon being reloaded

---

* Hon. Alfred T. Goodwin, Senior Judge, United States Court of Appeals for the Ninth Circuit, sitting by designation.

into a different van the Clevelands' goods were repacked.

This shipment—now several days late—then began its journey from Iowa to upstate New York. It appears—from information inserted into appellant's brief—that while en route, this second moving van was in an accident causing its fifth wheel to break through the floor of the truck, upheaving the Cleveland's furniture and creating a hole that exposed the truck's contents to water. Ultimately plaintiffs' goods arrived in Slingerlands, New York on August 30, 1988, a week late. When the truck was unloaded, the Clevelands immediately noticed that many of their possessions had been extensively damaged by rainwater that had soaked and stained some of the new items of furniture. Other damage had been caused by the furniture's upheaval or by sloppy repacking and reloading at Beltman's lot in Des Moines. Even though the damage was extensive and included items that would normally qualify for "priority" handling in their repair—for example, a home refrigerator was delivered without its doors being reattached—defendants nonetheless unreasonably assigned this claim to its representative to process on a "regular" basis.

Believing the supplemental plan they had purchased would expedite a recovery for their loss, the Clevelands on September 13, 1988, two weeks after their furniture arrived, made a timely claim with North American both for delay and actual damages to their belongings. The claim for delay damages was paid promptly by North American and is not at issue. Shortly after filing their damages claim the Clevelands realized several items were missing entirely, including Donald Cleveland's tax and business records. A supplemental claim was filed for this loss.

The claims settlement process started smoothly enough. North American dispatched Andrea Daley, who was associated with the Albany, New York firm of Restorers of America, to inspect the Clevelands' goods. She arrived at their home on October 5. During that visit and several others, she took many photographs of the damaged personalty. She also brought along a repairman from an upholstery shop to inspect the damage to the Clevelands' furniture, some of which had been stained purple. The settlement process subsequently grew acrimonious. The Clevelands sent several letters to North American regarding the status of their claims. None of them were answered. By mid-December 1988 the Clevelands, exasperated by this exhibition of foot-dragging by North American, refused to further assist Ms. Daley in her assessment of their property for settlement purposes.

In the second week of February 1989—nearly six months after they had moved—the Clevelands received an offer of settlement for the damages claim from North American in the amount of $9,824.46. As noted, the Clevelands also had submitted a claim that itemized their missing belongings. The offer included no money for their missing belongings, averring that Mr. Cleveland's signature on the delivery receipt indicated that all items had been delivered. This assertion, like much else in this record, reveals that defendants have little, if any, commitment to the truth. In fact, Mr. Cleveland had specifically crossed out the language in the receipt that North American relied upon, and had written instead: "Since the damage was extensive, we have not confirmed the presence of everything."

Plaintiffs rejected North American's offer on February 17, 1988. By letter dated March 30, 1989 North American declined to increase the settlement offer. Nearly four years later, in March 1993, on the eve of trial, North American offered $40,000 in settlement, which the Clevelands also refused.

### Proceedings Below

On April 26, 1989 the Clevelands commenced the instant action in the United States District Court for the Northern District of New York, asserting a number of causes of action. They alleged that defendants, first, failed to comply with Interstate Commerce Commission (ICC) regulations regarding shippers' rights and responsibilities under 49 C.F.R. § 1056.2 (1993); second, were guilty of fraud in inducing plaintiffs to sign the shipping contract; third, made negligent misrepresentations; and fifth and sixth,

were guilty of negligence and gross negligence respectively.

As their fourth claim, plaintiffs asserted breach of contract. This cause of action, as will become apparent in a moment, evolved into a statutory claim brought under the bill of lading, pursuant to 49 U.S.C. §§ 10103, 10730 and 11707 (Carmack Amendment), for the loss, damage or injury that the defendants caused to the Clevelands' goods.

Defendants' conduct during discovery further evinced their fixed attitude to stonewall claims and demands until forced by circumstances or court order to be forthcoming. Nearly seven months after the litigation began, plaintiffs sought copies of the photographs taken by Ms. Daley, and copies of various of defendants' procedure manuals. Defendants and their counsel declared that such manuals did not exist. Eventually the supposedly non-existing materials were found and turned over to plaintiffs, who then moved to sanction defendants. The magistrate to whom the matter was referred found "that defendants and defense counsel have together engaged in a continuing series of acts designed to frustrate the discovery process in a deliberate attempt to obstruct plaintiffs' prosecution of this litigation." Defendants and their counsel were accordingly sanctioned pursuant to Fed.R.Civ.P. 37. Plaintiffs were awarded attorney's fees amounting to $5,860. Defendants then retained present counsel.

In the wake of the discovery dispute, Chief District Court Judge Neal P. McCurn, in a decision and order dated February 13, 1992 granted plaintiffs' motion to amend their complaint to include a federal common law claim for breach of an implied covenant of good faith and fair dealing. The district court directed that damages, if any, for this claim were to be exclusive of damages awarded for actual loss under the bill of lading. It also permitted plaintiffs to add a claim for fraud with respect to the defendants' withholding and falsifying of business records.

When the parties later stipulated that there was a lawful, valid bill of lading, plaintiffs withdrew their fraud in the inducement, negligence, and gross negligence claims, that is, the second, fifth and sixth causes of action.

The trial court, Judge Frederick J. Scullin, Jr., submitted to the jury three theories of liability: (1) a claim for loss and damage to property under the Carmack Amendment, (2) a claim for a negligent misrepresentation of the terms and conditions of the protection plan, and (3) a tort claim for punitive damages based on a common law theory of breach of an implied covenant of good faith and fair dealing in the handling of plaintiffs' move and the processing of their loss and damage claim. Because it was unable to ascertain what the standard for a breach of the implied covenant of good faith and fair dealing claim should be, the district court looked to New York law for breach of an insurance contract, instructing the jury that it could award plaintiffs punitive damages if "defendants acted with such morally culpable conduct and wanton dishonesty so as to imply a criminal indifference to their civil obligations under the contract to transport [plaintiffs'] household goods."

The jury returned its verdict on March 5, 1993, awarding plaintiffs $28,000 in compensatory damages under the Carmack Amendment claim, and $50,000 in punitive damages for defendants' breach of the implied covenant of good faith and fair dealing. It found for defendants on the negligent misrepresentation claim. The district court entered a judgment confirming the jury's award on March 8, 1993.

Defendants then moved pursuant to Fed.R.Civ.P. 50(b) and 59 to set aside the punitive damage award and for a new trial. They argued that an award of punitive damages was preempted by the Carmack Amendment or, alternatively, that the award was inconsistent with New York law for such an award. Plaintiffs cross-moved for pre-judgment and post-judgment interest. Judge Scullin denied defendants' motion to set aside the punitive damage award and for a new trial; he granted plaintiffs' motion for interest and entered an amended judgment on May 17, 1993. This appeal followed.

## DISCUSSION

### I

Defendants urge on appeal that punitive damages were wrongly awarded as a matter

of law; that such an award was also wrong as a matter of fact as against the weight of the evidence; and that evidence of the discovery dispute was improperly admitted at trial. The only question we need address is the first one: whether the Carmack Amendment to the Interstate Commerce Act of 1887 (Act) preempts plaintiffs' claim under federal common law for breach of the implied covenant of good faith and fair dealing so as to make legally inappropriate the jury's award of $50,000 in punitive damages on this claim. Our disposition of this legally complex question, one of first impression in this and other circuits, makes it unnecessary for us to decide the two other issues raised.

■ The Carmack Amendment was passed in 1906 as part of the Hepburn Act, ch. 3591, 34 Stat. 584. It addresses the subject of carrier liability for goods lost or damaged during shipment, and most importantly provides shippers with the statutory right to recover for the *actual loss* or injury to their property caused by any of the carriers involved in the shipment. *See* 49 U.S.C. § 11707(a)(1) (1988) (emphasis added). Relevant portions of the Carmack Amendment are:

> A common carrier ... subject to the jurisdiction of the Interstate Commerce Commission ... shall issue a receipt or a bill of lading for property it receives for transportation.... That carrier ... and any other common carrier that delivers the property and is providing transportation or service subject to the jurisdiction of the Commission ... are liable to the person entitled to recover under the receipt or bill of lading. The liability imposed under this paragraph is for the actual loss or injury to the property caused by (1) the receiving carrier, (2) the delivering carrier, or (3) another carrier over whose line or route the property is transported in the United States....

*Id.* Of some significance is the following so-called savings clause, also a part of the Carmack Amendment:

> Except as otherwise provided in this subtitle, the remedies provided under this subtitle are in addition to remedies existing under another law or at common law. *Id.* § 10103.

This appeal is complicated by the fact that no legislative history accompanied the Amendment. It was adopted without discussion or debate. *See* 40 Cong.Rec. 7075 (1906). Shortly after its passage, the Supreme Court addressed the Carmack Amendment's scope in the then profuse area of railroad-related litigation. In a leading case, *Adams Express Co. v. Croninger,* the Court described the Amendment in broad, preemptive terms. *See* 226 U.S. 491, 506–08, 33 S.Ct. 148, 152–53, 57 L.Ed. 314 (1913). Reasoning that to construe the savings clause before it (a predecessor of § 10103) as grounds for allowing plaintiffs to avail themselves of state remedies would emasculate the Carmack Amendment itself, the Supreme Court said: "It would result in the nullification of the regulation of a national subject and operate to maintain the confusion of the diverse regulation which it was the purpose of Congress to put an end to." *Id.* at 507, 33 S.Ct. at 152. On several subsequent occasions, the Supreme Court reaffirmed this holding. *See, e.g., New York, N.H. & H. R.R. v. Nothnagle,* 346 U.S. 128, 131, 73 S.Ct. 986, 988, 97 L.Ed. 1500 (1953); *Atchison, T. & S.F. Ry. v. Harold,* 241 U.S. 371, 378, 36 S.Ct. 665, 668, 60 L.Ed. 1050 (1916).

The defendants misapply this precedent and confuse what is the ultimate issue before us, which is whether *all* causes of action—other than those premised on the bill of lading and brought under the Carmack Amendment—are preempted by the Carmack Amendment. In other words, the question we must decide is whether Congress has broadly occupied the *entire* field of interstate shipping to the exclusion of any other law and, in particular in this case, federal common law. We say the defendants have muddied the issue because they focus on the Carmack Amendment's preemption of state law.

We turn to defendants' position. The position they take is untenable because it analyzes the issue before us as though the Carmack Amendment was here preempting *state* law causes of action, skirting the fact that the

trial court attempted to craft a *federal* common law cause of action. Defendants rely on *Adams Express* and a host of circuit court cases that stand for the proposition that the Carmack Amendment preempts *state* common law remedies that might be asserted against a carrier for damages to goods shipped under a proper bill of lading. *See, e.g., Shao v. Link Cargo (Taiwan) Ltd.,* 986 F.2d 700, 705–06 (4th Cir.1993); *Hughes Aircraft Co. v. North Amer. Van Lines, Inc.,* 970 F.2d 609, 613 (9th Cir.1992); *Underwriters at Lloyds of London v. North Am. Van Lines,* 890 F.2d 1112, 1121 (10th Cir.1989) (en banc); *Intech, Inc. v. Consolidated Freightways, Inc.,* 836 F.2d 672, 677 (1st Cir.1987); *Hughes v. United Van Lines, Inc.,* 829 F.2d 1407, 1415 (7th Cir.1987), *cert. denied,* 485 U.S. 913, 108 S.Ct. 1068, 99 L.Ed.2d 248 (1988); *Hopper Furs, Inc. v. Emery Air Freight Corp.,* 749 F.2d 1261, 1264 (8th Cir.1984); *Air Prods. & Chems., Inc. v. Illinois Cent. G. R.R.,* 721 F.2d 483, 486–87 (5th Cir.1983), *cert. denied,* 469 U.S. 832, 105 S.Ct. 122, 83 L.Ed.2d 64 (1984); *W.D. Lawson & Co. v. Penn Cent. Co.,* 456 F.2d 419, 421 (6th Cir.1972).

We have had occasion to address the subject at issue only peripherally, holding in *North American Phillips Corp. v. Emery Air Freight Corp.,* 579 F.2d 229, 234 (2d Cir. 1978), that a shipper's claims based upon the loss of goods during interstate transport arose under federal law. In so deciding, we stated: "Congress has created a broad, comprehensive scheme covering the interstate shipment of freight, aimed at preventing preferential treatment among shippers and establishing national equality of rates and services. *This has occupied the field to the exclusion of state law.*" *Id.* at 233–34 (emphasis added).

None of these cases, including our own case, are particularly helpful in resolving the present issue. The district court, after acknowledging that federal law preempted the state law claims, adopted a federal common law rule in an attempt to circumvent the prohibition against state law being interposed in claims involving the shipment of goods in interstate commerce. The notion that federal law reigns supreme and preempts state law when uniformity on a national level is required is one of long standing. In discussing the need for the Supremacy Clause in the proposed Constitution, James Madison wrote that without it the whole of society would be subordinate to the authority of its parts. Our nation would be reduced to "a monster, in which the head was under the direction of the members." *The Federalist No. 44,* at 287 (Clinton Rossiter ed., 1961). The judicial development of the preemption doctrine put teeth in the Supremacy Clause, gave force to federal authority, and banished the specter conjured up by Madison.

Of course preemption has no application where the law to be preempted is a federal rule of common law. Thus, defendants' principal argument—that because state claims are preempted, a federal common law claim should be as well—simply misses the point. Federal common law should not ordinarily lead to disparate treatment of defendants in different federal courts.

We pass then to the precise issue in this case—whether federal common law claims arising out of a shipper's relationship with a common carrier are preempted by the Carmack Amendment. It is important in resolving this question to ascertain the outer boundaries of the Carmack Amendment's reach. Of some impact are several district court decisions that, in an attempt to create a more flexible approach to determining claims made in the interstate shipment of goods, have set themselves against the tide of statutory preemption of the field and looked instead to federal common law principles.

Most on point is *Drucker v. O'Brien's Moving & Storage Inc.,* 745 F.Supp. 616 (D.Nev.1990). Presented with facts almost identical to those before us, the district court permitted a claim for breach of the implied covenant of good faith and fair dealing to be asserted under federal common law. *See id.* at 619. The printed version of this holding is contained in a transcript of the district judge's bench decision, and cites no authority. This case was the exclusive authority the district court judge in the case at hand relied upon.

Other district courts have taken somewhat similar positions. In *Mesta v. Allied Van Lines International, Inc.,* 695 F.Supp. 63 (D.Mass.1988), the court allowed a state law claim for intentional infliction of emotional distress against a carrier. The court reasoned the claim was "based not on loss of property, but on the defendant's actions in investigating and responding to the plaintiff's claim. Such activities were not undertaken in the course of transporting goods, and are thus not within the scope of the Carmack Amendment." *Id.* at 65; *see also Sokhos v. Mayflower Transit, Inc.,* 691 F.Supp. 1578 (D.Mass.1988) (holding Carmack Amendment does not preclude state law claims for unfair acts or deceptive practices, or for unfair claims settlement practices because these claims are not based on loss or damage to the shipper's belongings); *Miller v. Aaacon Auto Transp., Inc.,* 447 F.Supp. 1201, 1205 (S.D.Fla.1978) ("[P]unitive damages might be recoverable under federal common law, where a carrier has injured a plaintiff by acting with 'actual malice or reckless or wanton indifference to the rights of the plaintiff.' ").

The just cited cases are purportedly the progeny of two more authoritative decisions. In *Missouri, Kansas & Texas Railway Co. v. Harris,* 234 U.S. 412, 34 S.Ct. 790, 58 L.Ed. 1377 (1914), the Supreme Court upheld an award of attorney's fees pursuant to a Texas statute in a substantive action brought under the Carmack Amendment. The decision rested upon the Court's unanimous view that the cause of action "d[id] not in anywise either enlarge or limit the responsibility of the carrier for the loss of property entrusted to it in transportation, and only incidentally affect[ed] the remedy for enforcing that responsibility." *Id.* at 420, 34 S.Ct. at 793–94. More recently, the Tenth Circuit similarly upheld an award of attorney's fees pursuant to an Oklahoma statute in a Carmack Amendment case, finding that it was an "incidental compensatory allowance." *A.T. Clayton & Co. v. Missouri–Kansas–Texas R.R.,* 901 F.2d 833, 835 (10th Cir.1990). Relying on *Harris,* the issue as framed by the Tenth Circuit was whether the claim "substantively enlarges the carrier's responsibility for the loss." *Id.*

As amply evidenced by the verdict in this case, punitive damage awards could have a dramatic impact on a carrier's liability and seriously enlarge a shipper's remedy. A claim for breach of the implied covenant of good faith and fair dealing resulting in an award of punitive damages could well thwart one of the primary purposes of the Carmack Amendment; that is, to provide some uniformity in the disposition of claims brought under a bill of lading, *see Hughes v. United Van Lines, Inc.,* 829 F.2d at 1415 (purpose of Carmack Amendment is to "eliminat[e] uncertainty as to a carrier's liability"). The Supreme Court has ruled that the Carmack Amendment's savings clause, now found at 49 U.S.C. § 10103, saves only those rights and remedies that are "not inconsistent with the rules and regulations prescribed by the provisions of this act.... [T]he act cannot be said to destroy itself." *Adams Express Co.,* 226 U.S. at 507, 33 S.Ct. at 152. Because the availability of punitive damages would frustrate the uniformity goal of the Carmack Amendment, the Clevelands' appeal to the savings clause does them no good. It may be that Congress' enforcement scheme does not provide a sufficient deterrent to the type of conduct defendants employed in this case. Nonetheless, it is plain that a claim for breach of the implied covenant of good faith and fair dealing cannot exist alongside the Carmack Amendment. It is not for the courts to read a new remedy into the Act, if there is to be a new remedy, it is one Congress must legislate.

## II

In urging us to affirm, the Clevelands point to the above authorities and to several other cases allowing federal common law claims. The Supreme Court's opinion in *Clearfield Trust Co. v. United States,* 318 U.S. 363, 367, 63 S.Ct. 573, 575, 87 L.Ed. 838 (1943), for one, is cited for the proposition that when a matter is of national concern, but there is an "absence of an applicable Act of Congress[,] it is for the federal courts to fashion the governing rule of law according to their own standards." We relied upon *Clearfield Trust,* in *Ivy Broadcasting Co. v. American Telephone & Telegraph Co.,* 391

F.2d 486, 491 (2d Cir.1968), where we concluded that a uniform rule of federal common law was necessary to fill a gap in the federal Communications Act of 1934 in order to best serve the statute's purpose. Recognizing the preemptive effect of the Communications Act on state law, the panel turned to federal common law—not unlike what the district court did in the instant case. *See also Nordlicht v. New York Telephone Co.,* 799 F.2d 859, 862 (2d Cir.1986) (relying on *Ivy Broadcasting* to hold that claims by a Canadian citizen against New York Telephone arose under federal common law), *cert. denied,* 479 U.S. 1055, 107 S.Ct. 929, 93 L.Ed.2d 981 (1987).

We are further mindful of the Supreme Court's opinion in *County of Oneida v. Oneida Indian Nation* where Justice Powell stated that:

> In determining whether a federal statute preempts common-law causes of action, the relevant inquiry is whether the statute "[speaks] *directly* to [the] question" otherwise answered by federal common law.... As we stated in *Milwaukee II,* federal common law is used as a "necessary expedient" when Congress has not "spoken to a *particular* issue."

470 U.S. 226, 236–37, 105 S.Ct. 1245, 1252–53, 84 L.Ed.2d 169 (1985) (quoting *City of Milwaukee v. Illinois,* 451 U.S. 304, 313–15, 101 S.Ct. 1784, 1790–92, 68 L.Ed.2d 114 (1981)) (emphasis in original). All of this authority, which was cited by the Clevelands, is inapplicable in the context of the Carmack Amendment. *Oneida Indian Nation* is readily distinguishable because in that case Congress had not touched upon the subject matter at issue in the relevant statutes. *See* 470 U.S. at 237, 105 S.Ct. at 1252–53. The *Clearfield Trust* line of cases is also inapposite because in the context of interstate commerce, Congress has spoken directly and comprehensively, creating no need to develop rights judicially to ensure that Congress' aim is fulfilled.

Under the Carmack Amendment Congress has specifically addressed the issue of a shipper's compensation. *See* 49 U.S.C. § 11707(a)(1). In addition, the Interstate Commerce Act subjects carriers to a host of rules and regulations promulgated and enforced by the ICC. *See Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co.,* 450 U.S. 311, 318, 101 S.Ct. 1124, 1130–31, 67 L.Ed.2d 258 (1981) ("The Interstate Commerce Act is among the most pervasive and comprehensive of federal regulatory schemes."). There is a certification procedure for carriers, *see* 49 U.S.C. § 10922(b)(1) (1988), and the ICC has the ability to revoke or suspend carriers' certificates for willful violations of the Act or ICC regulations, *see id.* § 10925(b), or to impose monetary penalties against carriers, *see id.* § 11901(j). Further, the ICC can investigate carrier violations of its rules and regulations or of the Act, *see id.* § 11701(a), and individuals can register complaints with the ICC, *see id.* § 11701(b). Notably, ICC regulations govern the disposition of damage claims. *See* 49 C.F.R. Part 1005 (1993).

As the Supreme Court teaches in *Massachusetts Mutual Life Insurance Co. v. Russell,* 473 U.S. 134, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985), we should be reluctant to use federal common law to supplement comprehensive legislation. In the course of examining the scope of ERISA, the Court opined: "[W]here a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it." ... "The presumption that a remedy was deliberately omitted from a statute is strongest when Congress has enacted a comprehensive legislative scheme including an integrated system of procedures for enforcement." *Id.* at 147, 105 S.Ct. at 3093 (quoting *Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 19, 100 S.Ct. 242, 246–47, 62 L.Ed.2d 146 (1979) and *Northwest Airlines, Inc. v. Transport Workers Union,* 451 U.S. 77, 97, 101 S.Ct. 1571, 1583–84, 67 L.Ed.2d 750 (1981)). *Accord Middlesex County Sewerage Auth. v. National Sea Clammers Ass'n,* 453 U.S. 1, 15, 101 S.Ct. 2615, 2623–24, 69 L.Ed.2d 435 (1981) ("In the absence of strong indicia of a contrary congressional intent, we are compelled to conclude that Congress provided precisely the remedies it considered appropriate."); *cf. Hopper Furs, Inc.,* 749 F.2d at 1264 ("All actions against a common carrier ... are governed by the federal statute.").

Consequently, because the issue of a shipper's compensation for actual loss or injury to its property has been comprehensively and directly addressed by the Carmack Amendment, a federal common law cause of action—even assuming such exists—is displaced by the Act that has established those remedies Congress deems appropriate in this field.

## CONCLUSION

Insofar as the judgment of the district court awarded plaintiffs punitive damages, it is reversed; it is otherwise affirmed.

Each party to bear its own costs.