[L. A. No. 1724.  In Bank.—August 22, 1907.]

# DONLON BROTHERS, Respondents, v. SOUTHERN PA-CIFIC COMPANY, Appellant.

# HENRY DELANEY, Respondent, v. SOUTHERN PA-CIFIC COMPANY, Appellant.

COMMON CARRIERS—RAILROAD—AGREEMENT AS TO VALUE OF PROPERTY SHIPPED—LIMITING LIABILITY.—A contract between a railroad company and a shipper, reasonable and voluntarily entered into by the parties, the primary purpose of which was, as the rates of transportation charged by the railroad were measured by the valuation of the property shipped, to fix an agreed valuation on such property as a basis upon which freight rates should be charged and paid, on condition that in case of loss the railroad's liability should be measured by such agreed valuation, is to be construed as an agreement fixing the valuation of the property shipped, and not as a contract limiting the liability of the railroad; and in case of loss through the gross negligence of the railroad, its liability cannot exceed the valuation so fixed.

ID.—LOSS THROUGH GROSS NEGLIGENCE.—Section 2175 of the Civil Code, providing that a common carrier cannot be exonerated by any agreement made in anticipation thereof from liability for its gross negligence, does not prohibit such a contract, nor prevent it from having such effect.

ID.—REASONABLENESS OF CONTRACT.—In determining whether such a contract is fair or reasonable, no consideration can be taken of the fact whether the agreed value of the property reasonably approximated its real value. In the present case, the contract under consideration is held to have been freely and fairly made, and to be reasonable.

APPEALS from judgment of the Superior Court of Ventura County.  Felix W. Ewing, Judge.

The facts are stated in the opinion of the court.

Canfield & Starbuck, for Appellant.

Thomas O. Toland, and Merle J. Rogers, for Respondents.

LORIGAN, J.—These two cases were tried together, and are presented here on the same record.

The complaints alleged that defendant, as a common carrier, contracted to transport from Salinas to Sacramento, in this state, certain racehorses belonging to plaintiffs; that through its gross negligence in the management of its train while en route one horse was killed and another injured, to plaintiff's damage in the sum of fifteen hundred and twelve hundred dollars, respectively.

The answer of defendant denied that it had been guilty of gross or any negligence in the transportation of said horses, and for a further and separate defense set out a special contract entered into by the plaintiffs with defendant relative to the carriage of said property and under which it averred that, if liable at all, it was not liable beyond the sum of twenty dollars in each case, the agreed valuation of each horse as fixed in such contract of shipment respectively.

Upon the trial, aside from other evidence in the case, the execution of a special contract relative to the carriage of these horses as averred by defendant was proven; in fact, its execution was not questioned. In that regard it appeared that plaintiff Delaney, in his own behalf, and as agent for the other plaintiffs, the Donlon Brothers, applied to defendant at Salinas on August 24, 1902, for the transportation from that point to Sacramento of five horses, including those involved in this action. The result of the negotiations between them was that Delaney chartered for forty-two dollars charges a whole car to transport the horses, and a certain document in relation thereto was executed by himself and the agent of the defendant. This document was divided into several parts, and was in form such as was generally provided by the defendant for execution where a special rate for transportation on an agreed valuation was obtained. The first part consisted of a request by the shipper to the carrier to accept a specified shipment, which, in the present instance, Delaney stated in his own handwriting, inserted in blanks left for that purpose, consisted of five horses consigned to himself at Sacramento from Salinas, and of the value of twenty dollars apiece. The request contained a further statement by him that he desired to procure the form of contract set out below the request, and constituting the second part of the sheet, the provisions of which he declared had been read by him, and were freely understood and accepted, in consideration of

the lower shipping rate thereby to be obtained. This request was filled out by him, and, containing the statements indicated, was signed by Delaney. The next part of the document, which immediately followed the request as signed, consisted of a contract which referred to the request and the valuation of the horses stated therein, and was signed by the defendant and Delaney. This contract provided that Delaney should load, feed, and water the stock, etc., and that the defendant should transport it between the points named for forty-two dollars freight charges, and then further provided, "and second party [plaintiffs] hereby specially agrees, that in no event is first party [defendant] . . . to be liable for any loss or damage to said live-stock not proven to have been caused by the gross negligence of first party in the performance of or failure to perform, some duty which under the terms of this contract is due from first party to second party as to said live-stock. And it is expressly agreed by second party, that the amount to be by him claimed for each animal as described herein for loss or damage, shall be adjusted on the basis of value at the time and place of shipment not exceeding the declared value as hereinbefore set forth, and on which declared value the rate or rates of transportation hereinbefore named by first party are based, and in no event is there to be any recovery from first party . . . for any loss of, or damage to, said live-stock from whatsoever cause arising in excess of the declared value hereinbefore set forth." This contract was followed by the third part of the document, which consisted of a statement that the published rates of transportation under these special contracts applied only to ordinary live-stock, and set forth two schedules, the first of which enumerated the ordinary kind of live-stock to which such rates applied, and fixed what was deemed the ordinary valuations of such animals, and declared that such rates only applied in the case of ordinary animals, and as to horses applied only to racehorses sent by passenger-train whose actual and declared value did not exceed one hundred dollars, and to other horses whose actual and declared value did not exceed twenty dollars. It was further stated that values of animals in excess of those specified in this schedule should be deemed extraordinary and subject to increased charges as compared with charges for such ordinary live-stock, and the

second schedule, as set forth, showed what these charges should be—that for every one hundred per cent increase in valuation of such live-stock over the ordinary valuation, there would be under these special contracts an increase of ten per cent in the freight charges. These statements and schedules were a portion of the matters referred to in the request signed by Delaney, and which he stated therein he had read and agreed to. The last portion of the document is immaterial to the question presented here, and hence is not stated.

These papers having been executed and delivered, the defendant undertook the carriage of the horses to their destination, and on the journey an accident happened to the train, occasioning the loss of the two horses mentioned in the complaint under circumstances which, the plaintiffs claim and the jury found, constituted gross negligence on the part of defendant.

Aside from the evidence relative to the making of the special contract, the cause was fully tried upon the other issues involved, and a general verdict returned by the jury in favor of the Donlon Brothers for three hundred and fifty dollars, found by them to be the value of the horse killed, and in favor of Delaney for two hundred dollars damages for the horse injured.

Judgments having been entered on the verdicts, defendant appeals therefrom, its appeals being accompanied by a bill of exceptions in which the errors relied on for a reversal are presented.

The principal question arising on this appeal relates to the effect which is to be given to the special contract proven to have been entered into between plaintiffs and the defendant, conceding, as we think it must be, that there was sufficient evidence in the case warranting the jury in finding that the defendant was guilty of gross negligence occasioning the loss and injury complained of.

At the close of the evidence the defendant requested the court to instruct the jury that if they should find for the plaintiffs their verdict should not exceed twenty dollars damages in favor of each. This instruction the court refused to give, but instructed them that if they found the defendant was guilty of gross negligence in the carriage of the horses, they should find in favor of plaintiffs for their value not

exceeding the amount stated in the complaint. The defendant excepted to the action of the court with relation to these instructions, and under these rulings is presented the question as to what extent the liability of the defendant was affected by the execution of the special contract.

The view taken by the trial court was, and it is the position taken by counsel for respondent here, that while under the provisions of the Civil Code a common carrier may limit its liability for ordinary negligence (sec. 2174), it is prohibited by section 2175 thereof from doing so as to its gross negligence, this latter section providing that "a common carrier cannot be exonerated, by any agreement made in anticipation thereof, from liability for the gross negligence, fraud or willful wrong of himself or his servants"; and in the light of that section it is claimed by respondents that the special contract relied on was an attempt to limit the liability of defendant for damages for gross negligence to the agreed value of the horses as stated in it, and was therefore void, and for that reason plaintiffs were entitled to recover for the actual value of the horses, if gross negligence of defendant occasioned their loss, independent of the terms of the special contract providing that such liability of defendant should not exceed the agreed amount.

On the other hand, the position of appellant as to such contract, or rather as to the several instruments executed by plaintiffs and defendant,—the request for the shipment signed by plaintiffs alone and the bilateral special contract executed by plaintiffs and itself,—is—1. That aside from the special contract, and eliminating its consideration from the case entirely, the plaintiffs were estopped by their statement of value in the request for shipment from subsequently claiming that the horses injured were of any greater value than as stated therein; and 2. That as to the special contract itself, it did not attempt to limit the liability of defendant for gross negligence, but, on the contrary, the defendant thereby assumed full liability for any loss occasioned to the extent of the full value of the property shipped, and which value was fixed by the terms of the agreement.

While we are satisfied that both positions of appellant are correct, we perceive no reason why they should be considered separately. The special contract refers to the request, with

the valuations stated therein, and limits the liability of defendant for loss to an amount not in excess of such declared value, and hence is to be deemed a part of the contract. The authorities, also, to which we shall presently refer, discuss both the effect of such statements of value by the shipper as representations constituting an estoppel and as agreed valuations purely matter of contract affecting the responsibility of the carrier for negligence. These cases involved the consideration of special contracts such as the one involved here, and although the execution of such contracts was not preceded by a request for shipment in which the valuation of the property was declared by the shipper (the valuations there being only mentioned in the contract executed by the parties), still such valuations as creating an estoppel and also as a matter of contract were considered and discussed.

Now, to examine the contract under the terms of section 2175 of the Civil Code, to see if it comes within its prohibition. That section prohibits the carrier from entering into any contract in anticipation of gross negligence exonerating itself from liability therefor. Undoubtedly, a contract which attempted to relieve the carrier from liability for gross negligence, or attempted to fix a liability for only half the actual value of the property carried, or any other proportion less than such actual value, would be obnoxious to the prohibition of the section and void. But the contract in question here does not attempt to relieve the carrier from liability for the actual value of the property shipped, nor does it provide for any partial exemption from liability; nor does it provide for exemption from responsibility at all. On the contrary, the carrier assumes full responsibility for loss or injury to the property occasioned through its gross negligence to the full extent of the actual value of the property as declared by the shipper, and which valuation, by the contract between them, was agreed to be its actual valuation for all purposes. As to these purposes, it is not correct to assume that the special contract was made solely in anticipation of liability, or that liability was the principal subject-matter of the contract. It was not entered into with a view of providing solely for exemption, nor was that by any means its contemplated purpose. While it is true that the actual value of property may in fact be in excess of an agreed valuation in a contract, and as to that excess it may be said that the carrier is exonerated

from liability, this does not render the contract, otherwise fairly entered into fixing the agreed valuation, invalid.    If to that extent exemption may be said to result in some instances under an agreed valuation, it only follows indirectly, because it is not the main or chief object of the contract to attain it.    The primary purpose of this contract was, as the rates of transportation charged by the carrier were measured by the valuation of the property shipped, to fix an agreed valuation of the horses in question as a basis upon which freight rates should be charged and paid, on condition that in case of loss the responsibility of appellant should be measured by such agreed valuation.    The contract is one in which the valuation of the property was agreed to for the purpose of fixing transportation charges and as measuring the responsibility of appellant.    It was not a contract limiting liability.    It was a contract dealing primarily with value—the value of the horses shipped.    That was agreed to, and, of course, the agreed valuation must be deemed to be the actual valuation of the property—its actual valuation for all purposes of the contract; and as appellant assumed responsibility for loss to the full extent of such valuation there is no room for claiming that the contract was an attempt to exonerate it from the liability which the statute imposed.    On the contrary, it assumed under it full liability for the actual value as that actual value was agreed on.    Under this view of the contract we cannot see how it violates the section of the code relied on.    That section, while it prohibits contracts relieving the carrier from liability for the value of property intrusted to it for carriage and lost through its gross negligence, was not intended to limit the right of contract between shipper and carrier as to what that value may be.    It prohibited only the making of a contract limiting liability.    The limitation of liability necessarily imports a responsibility less than full responsibility.    Full responsibility under the statute for the loss of the property carried could not exceed its actual value, and while under the statute a carrier cannot by contract exonerate itself from liability for such value, there is nothing in the statute which prohibits the parties by contract from determining freely in advance what the actual value of such property is as the measure of the responsibility of the carrier when it attaches.

CLI Cal.—49

Now, as to the authorities. At common law a common carrier might make any other contract relative to the carriage of property intrusted to it, save one exempting it from liability for any kind of negligence. This rule was founded upon considerations of public policy, it being deemed derogatory thereto to allow a common carrier to contract against its own negligence, because to permit this had a tendency to promote negligence. But, as far as ordinary negligence is concerned, the rule at common law has been abrogated by our code (sec. 2174) to the extent that the shipper and carrier may now contract for the purpose of limiting the liability of the latter therefor. The prohibition of the common law against a carrier limiting his liability for any kind of negligence is declared in this state by section 2175 only to apply to the limitation for gross negligence. But, in so declaring, our statute has added nothing to the restrictive force of the common-law rule. Declaring the same rule as it existed at common law, and nothing more, the section should not be construed as restricting the right of contract to any narrower compass than the common law restricted it. In fact, section 2175, as it is but a declaration of that rule as far as it applies to contracts limiting liability for gross negligence, should not be interpreted as restricting the right of contract as to an agreed valuation of property for the purpose of fixing responsibility any further than it was restricted under the common-law rule. At common law such agreed valuation was not considered a limitation of liability for either ordinary or gross negligence. In jurisdictions in this country where the common-law rule obtains, it is the prevailing doctrine that there is a wide distinction between a contract by a carrier providing for exemption from liability for its negligence and a contract fairly entered into whereby, in consideration of a reduced rate of compensation for the transportation, the shipper and carrier agree upon a fixed valuation therefor under which the responsibility of the carrier in case of loss shall be measured.

In his work on Carriers, Hutchinson, at section 250, notes the distinction, where, after discussing cases involving the question of contracts providing for total exemption of carriers in cases of negligence, he says: "To be distinguished from these cases, however—though the distinction is not always observed—are those cases, obviously different, in which, for

the purpose of determining the shipper's liability for freight and the carrier's responsibility for damages, the value of the property is agreed upon.''

The leading case marking this distinction is that of *Hart* v. *Pennsylvania R. R. Co.,* 112 U. S. 331, [5 Sup. Ct. 151]. The distinction is further pointed out and approved in many of the state courts, most of them, like the supreme court of the United States, holding that agreements such as are involved here do not constitute contracts limiting liability on the part of the carrier, and all holding that in any view the shipper is estopped from questioning the value as represented by him and agreed on.

In the Hart case where the provision of the contract under consideration was that ''The carrier assumes liability on the stock (horses) to the extent of the following valuation,'' the court said relative to it ''That where the contract of the kind signed by the shipper is fairly made, agreeing on the valuation of the property carried, with the rate of freight based on the condition that the carrier assumes liability only to the extent of the agreed valuation, even in case of loss or damage by the negligence of the carrier, the contract will be upheld as a proper and lawful mode of securing a due proportion between the amount for which the carrier may be responsible and the freight he receives, and of protecting himself against extravagant and fanciful valuation. . . . There is no justice in allowing the shipper to be paid a large value for an article which he has induced the carrier to take at a low rate of freight on the assertion and agreement that its value is a less sum than that claimed after a loss. It is just to hold the shipper to his agreement fairly made as to value even where the loss or injury has occurred through the negligence of the carrier. The effect of the agreement is to cheapen the freight and secure the carriage if there is no loss and the effect of disregarding the agreement after a loss is to expose the carrier to a greater risk than the parties intended he should assume. . . . The limitation as to the value has no tendency to exempt from liability for negligence. It does not induce want of care. It exacts from the carrier the measure of care due to the value agreed on. The carrier is bound to respond in that value for negligence. The compensation for carriage is based on that value. The shipper is estopped from

saying that the value is greater. The articles have no greater value for the purpose of the contract of transportation between the parties to that contract. The carrier must respond for negligence up to that value. It is just and reasonable that such a contract fairly entered into and where there is no deceit practiced on the shipper should be upheld. There is no violation of public policy. On the contrary it would be unjust and unreasonable and would be repugnant to the soundest principles of fair dealing and of the freedom of contract and thus in conflict with public policy if a shipper should be allowed to reap the benefit of the contract if there is no loss and to repudiate it in case of loss. . . .

"The distinct ground of our decision in the case at bar is that where a contract of the kind, signed by the shipper, is fairly made, agreeing on the valuation of the property carried, with the rate of freight based on the condition that the carrier assumes liability only to the extent of the agreed valuation even in case of loss or damage by the negligence of the carrier, the contract will be upheld as a proper and lawful mode of securing a due proportion between the amount for which the carrier may be responsible and the freight he receives and of protecting himself against extravagant and fanciful valuations."

In the case of *Graves* v. *L. S. and M. S. R. R. Co.*, 137 Mass. 33, [50 Am. Rep. 282], where the valuation was contained in a bill of lading in which it was stipulated that the goods were "shipped at an agreed valuation of $20 per barrel," it is said: "If we adopt the general rule that a carrier cannot . . . exempt himself from responsibility . . . we are of opinion that it does not cover the case before us, which must be governed by other considerations. The defendant has not attempted to exempt itself from liability for the negligence of its servants. It has made no contract for that purpose, but admits its responsibility. . . .

"The care to be exercised in transporting property and the reasonable compensation for its carriage depend largely on its nature and value. . . . It is just and reasonable that a carrier should base his rate of compensation to some extent upon the value of the goods carried; this measures and is an important element in fixing his compensation. If a person voluntarily represents and agrees that the goods delivered to a

carrier are of a certain value and the carrier is thereby induced to grant him a reduced rate of compensation for the carriage, such person ought to be barred by his representations and agreement.   Otherwise, he imposes upon the carrier the obligations of a contract different from that into which he has entered. . . . We are of opinion that the plaintiffs are estopped to show that 'the property shipped' was of greater value than that represented.   The plaintiffs cannot recover a larger sum without violating their own agreement.   Although one of the indirect efforts of such a contract is to limit the extent of the responsibility of the carrier for the negligence of its servants, this was not the purpose of the contract.   We cannot see that any consideration of a sound public policy requires that such contracts should be held invalid or that a person who in such contract fixes a value upon his goods, which he intrusts to the carrier, should not be bound by his valuation.''

In two cases in this court, while the particular section of our code as to contracts limiting liability for gross negligence was not directly involved, still, discussing the effect of an agreed valuation in a contract between a shipper and carrier, the court expressed itself in approval of the rule laid down in the Hart case.   Said this court: ''There is a wide distinction between a contract for exemption from liability in case of negligence which is usually held in derogation of public policy tending to encourage negligence and a contract fairly made whereby in consideration of a lower freightage, the parties agree upon a fixed or determinate value to be placed upon the article to be shipped, in case of its loss.''   (*Pierce* v. *Southern Pacific Co.*, 120 Cal. 156, 166, [47 Pac. 874, 52 Pac. 302].)

Also, ''It would be unreasonable for a shipper to expect his packages to be carried for a compensation based upon an agreed valuation much less than the actual value and then, in case of loss, recover the full value. . . . Where . . . the shipper agrees to a certain value, he should not be heard in case of loss to claim a greater value.   Such a contract is fair and reasonable and is not contrary to public policy.   It is not a contract that relieves the carrier from responsibility for his own misbehavior; he is liable in case of loss for the value of the packages as agreed to by the shipper, and upon which value he pays a reduced compensation for the carriage. Limi-

tation as to value does not excuse negligence.'' (*Michalitschke* v. *Wells Fargo & Co.,* 118 Cal. 683, 688, [50 Pac. 847].)

We content ourselves with thus quoting at length from these authorities. They discuss the matter fully and declare principles which should govern in construing contracts of this nature.

To the same effect are *St. Louis etc. Ry. Co.* v. *Weakly,* 50 Ark. 397, [7 Am. St. Rep. 104, 8 S. W. 134]; *Zimmer* v. *New York etc. R. R. Co.,* 137 N. Y. 460, [33 N. E. 642]; *Jennings* v. *Smith,* 106 Fed. 139, [45 C. C. A. 249]; *Bermel* v. *New York etc. R. R. Co.,* 172 N. Y. 639, [65 N. E. 1113]; *Hill* v. *Northern Pacific Ry. Co.* 33 Wash. 697, [74 Pac. 1054]; *O'Maley* v. *Great Northern Ry.,* 86 Minn. 380, [90 N. W. 974]; *Railway* v. *Sowell,* 90 Tenn. 17, [15 S. W. 837]; *Normile* v. *O. R. and N. Co.,* 41 Or. 177, [69 Pac. 928].

It is true that there are some authorities holding to a contrary doctrine, as there are those which sustain contracts exempting carriers from all liability for negligence, but the weight of American authority is in support of the doctrine announced in the Hart and other cases cited.

While the authorities referred to discuss the effect of such contracts arising in cases where only ordinary negligence was involved, that can make no difference in the application of the principle to cases involving gross negligence. It is obvious that in principle it can make no difference what the character of the negligence may be. As it is pertinently said in *Calderon* v. *Atlas S. S. Co.,* 69 Fed. Rep., 574, 578, [16 C. C. A. 332], ''Such a valuation would necessarily, in the absence of fraud, conclude both the shipper and the carrier upon any inquiry as to the amount of damages arising from a loss and the contract would therefore extend to any kind of a liability.''

It will be observed in the authorities quoted that they speak of a contract which is reasonable and freely made between the parties. In the case at bar there can be no question of the reasonableness of the contract. It was based upon a consideration of a rate of transportation much lower than it would have been had the valuation been higher, or if the carrier assumed all the risk which the shipper now seeks to charge it with. The impracticability of establishing one rate for the transportation of stock of different values is universally recognized. Rates for transportation are based upon the value of

the property, and it is only natural that the amount of care which is to be exercised by the carrier in the protection of the property will be largely determined by its value. In the case at bar, following the general rule, defendant established freight rates under these special contracts of shipment which were proportional to the value of the property shipped—an increase of ten per cent in the freight charges for a rise of one hundred per cent in the value of horses to be transported, which cannot be said to be an unreasonable charge.

As to the contract being freely and fairly made. Delaney had shipped these horses over the road of the defendant before and on just such a contract, containing the same valuations as appear in the one in question here. Before this latter con-tract was entered into, he had discussed with the agent of the defendant the shipment and the rate of shipment of these horses. He was not required to ship them under the contract. If he did not consider the rates thereunder reasonable, he was not required to take them. He could have shipped them under an ordinary bill of lading, though at a higher rate of freight, and in case of loss could have recovered whatever they were worth. Even under the contract he was not required to place the valuation on them that he did. He fixed the valuation on them himself; the defendant had nothing to do with it. And he knew when he signed the contract that it provided that the liability of defendant was limited by its terms to the value of twenty dollars for each horse as he had valued them. As we have said, these special contracts pro-vided for freight rates proportionate to the value of the horses shipped. Delaney could have put their valuation at any higher rate than twenty dollars, which he deemed they were worth. There was nothing to prevent him from doing so. It was solely a matter of choice with him, and in fixing the valuation he did he could have been prompted only by a desire to obtain a low freight rate based on this low valuation.

Nor in determining whether such a contract is fair or rea-sonable, can there be taken into consideration the fact whether the agreed value of the property reasonably approximated its real value. That question was presented in some of the cases cited. In *Hill* v. *Northern Pacific Ry. Co.*, 33 Wash. 697, [74 Pac. 1054], in reply to a contention of counsel for appellant urging that it should, the court said: ''An examination of the

cases cited we do not think sustains this contention, and even where there has been an attempt to make this distinction, it has been in principle a failure. The contract establishing the released valuation must be construed to embrace the real valuation.'' In the Hart case, 112 U. S. 331, 337, which was a suit relative to the value, as here, of racehorses, the court dismisses that contention as without merit, saying: ''Although the horses, being racehorses, may. aside from the bill of lading have been of greater value than that specified in it, whatever passed between the parties before the bill of lading was signed was merged in the valuation it fixed. . . .'' In *Steers* v. *L. N. Y. and P. S. S. Co.*, 57 N. Y. 1, [15 Am. Rep. 453], the agreed valuation of the trunk in question was fifty dollars, whereas it was shown that the value of its contents exceeded one thousand dollars. In *Zimmer* v. *New York etc. R. R. Co.*, 137 N. Y. 460, [33 N. E. 642], the agreed valuation was one hundred dollars, though the value thereof found by the jury was over three thousand dollars. And in all the other cases cited sustaining such special contracts, necessarily the actual valuation must have exceeded the agreed valuation, and the question whether it did or not must have been held to be immaterial.

We do not think that this matter requires any further discussion. Under the authorities the special contract entered into between plaintiffs and defendant cannot be held invalid as one exempting the defendant from liability for gross negligence. It does not do so, nor pretend to do so, but, on the contrary, must be sustained as a reasonable contract freely entered into by the shipper and under which the defendant assumed full responsibility for the actual value of the property as such value was fixed by the parties, and defendant cannot be made responsible for loss in an amount exceeding that agreed valuation. The court erred in refusing to instruct the jury that they could not return a verdict exceeding the agreed valuation in each case,—twenty dollars,—and for that reason the judgment is reversed and a new trial ordered.

McFarland, J., Henshaw, J., Angellotti, J., Sloss, J., and Beatty, C. J., concurred.

SHAW, J., dissenting.—In the absence of a special contract on the subject, when goods under shipment are destroyed by the gross negligence of the carrier, the extent of the liability of the carrier in damages is the actual value of the goods. If a carrier makes an agreement in advance, that its liability for such destruction by its own gross negligence shall not be the actual value of the goods,—one thousand dollars, for instance, —but a smaller amount, which the carrier and the shipper agree shall be considered, for the purposes of the shipment, the value of the goods,—one hundred dollars, for instance,— I am unable to perceive why such a contract does not exonerate the carrier from liability for its gross negligence to the extent of nine hundred dollars. And if a contract has that effect, I cannot see why the fact that the effect desired is not directly contracted for in express terms makes it any the less a violation of section 2175 of the Civil Code, which prohibits the making of such contracts. The exemption from liability, to the extent of the difference between the actual value and the stated value, is expressly contracted for in the agreement in question here, however.

If we hold that this contract is not forbidden by the provision of the code, then that provision is practically annulled. Theoretically no person is compelled to avail himself of the services of common carriers, for he may walk or hire his own conveyance, but practically the thing is compulsory, and the terms must be those fixed by the carrier.

If the provision were made solely or chiefly for the benefit of the shipper or passenger, the theory that he might waive his right, or that he might be estopped to assert it by his conduct or by his contract freely made, would be perfectly sound and reasonable. But the law is not made for the benefit of the shipper or passenger alone. It is founded on public policy having for its object the safety of human beings from death or injury and the prevention of the destruction of property. Where a course of conduct is required by law, in furtherance of such public policy, it is not within the province of the individual immediately interested to dispense with an obedience to its provisions by any agreement, or to obviate its effects by his conduct making it inequitable, as between himself and the other party, to enforce it. The law in such cases makes use of his interest as a means of

enforcing the provisions adopted for the purpose of securing the safety of the traveling public and preventing the negligent destruction of property. He is to that extent a public agent, and as such he should not be permitted to divest himself of the right and power to act.

In those jurisdictions where this policy exists solely by virtue of the common law, which is the creature of the judicial power, I concede that the same power is competent to qualify it or limit its application, although the modification may render the policy practically fruitless. But in this state the policy is the creature of the legislative power; it has been established by legislative act, which in such matters is superior to the judiciary; and I do not believe that it should be within the power of the courts to declare that the parties immediately concerned may by their previous conduct, or by agreements made in advance, defeat the purpose of the law.