[No. A103021. First Dist., Div. Four. Mar. 25, 2005.]

POWER STANDARDS LAB, INC., Plaintiff and Respondent, v.
FEDERAL EXPRESS CORPORATION, Defendant and Appellant.

1040

COUNSEL

Shane & Taitz, David R. Shane and Timothy A. Ginn for Defendant and Appellant.

Michael A. Mazzocone for Plaintiff and Respondent.

## OPINION

**KAY, P. J.**—Damage to electronic equipment being shipped by defendant Federal Express Corporation (Federal Express) led to litigation that culminated in a judgment in favor of Plaintiff Power Standards Lab, Inc. (PSL) for $78,000 in compensatory damages and $600,000 in punitive damages. The dispositive question is whether federal law—in the form of a preemption provision in the Airline Deregulation Act of 1978 and a doctrine of federal common law—precludes a state court from awarding any relief greater than was expressly and contractually negotiated between the carrier and the shipper. We answer this question in the affirmative. We hold that once the shipper has paid the contractual limit of its liability, state common law and statutory remedies cannot augment that recovery.

### BACKGROUND

Because issues of law resolve this appeal, it is not necessary to recount the evidence introduced at the trial except in the briefest form most favorable to PSL. (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 787 [16 Cal.Rptr.3d 374, 94 P.3d 513].)

PSL shipped a prototype piece of electronic equipment from its Emeryville factory to San Diego, using Federal Express as the shipper. The shipping airbill stated Federal Express's liability policy:

*"Limitations On Our Liability And Liabilities Not Assumed*

"Our liability in connection with this shipment is limited to the lesser of your actual damages or $100, unless you declare a higher value, pay an additional charge, and document your actual loss in a timely manner. You may pay an additional charge for each additional $100 of declared value. The declared value does not constitute, nor do we provide, cargo liability insurance. [¶] In any event, we will not be liable for any damage, whether direct, incidental, special, or consequential in excess of the declared value of a shipment, whether or not Federal Express had knowledge that such damages might be incurred including but not limited to loss of income or profits." PSL paid for $20,000 of additional "declared value" coverage from Federal

Express.[1] The airbill also set forth the procedures for "Filing A Claim," which included: "For us to process your claim, you must make the original shipping cartons and packing available for inspection."

The shipment arrived badly damaged. PSL's president called Federal Express's 800 telephone number and was repeatedly told that no inspection was necessary, and that after PSL had the equipment repaired, it should submit a claim for the amount of repair expenses. PSL paid $17,450 to have the equipment repaired, and submitted a claim for that amount. Federal Express denied the claim because the equipment had not been inspected before it was repaired. Four months of repeated entreaties produced no change in Federal Express's position. Having been told "the only way FedEx pays claims like this is if you sue us," PSL reluctantly did so.

Six weeks before the scheduled trial date, Federal Express sent PSL a check for $18,409.45 (the $17,450 costs of repair, plus a refund of the $959.45 originally charged to ship the equipment). By that time PSL had incurred more than $78,000 of attorney fees. It therefore proceeded to trial on its causes of action for breach of contract and recovery of attorney fees based upon breach of the implied covenant of good faith and fair dealing. The jury found that Federal Express breached its contract with PSL, and also breached "the duty of good faith and fair dealing it owed to [PSL] by unreasonably denying the claim." The jury awarded PSL $78,027.08 representing "the amount of attorney's fees . . . [PSL] reasonably incurred to collect the benefits due under the contract." The jury also awarded PSL punitive damages of $1.5 million. The trial court denied Federal Express's motion for judgment notwithstanding the verdict, but it conditionally granted a new trial unless PSL agreed to accept only $600,000 of punitive damages. After PSL consented to this reduction, Federal Express perfected this timely appeal.

## REVIEW

Federal Express advances a number of contentions centered on the argument that federal law limited PSL's damages to recovery of no more than PSL's original claim for repair costs of its equipment, which Federal Express paid. This case should never have been tried because PSL was seeking forms of relief under California law that are precluded by federal law. The Airline Deregulation Act of 1978 (ADA) and two decisions of the United States Supreme Court interpreting the ADA establish that Federal Express cannot be made to pay for more than the declared value of the equipment. The same result is also compelled by the federal common law doctrine limiting a carrier's liability to the value of a shipment declared by a shipper to the

---

[1] The invoice value of the equipment was $48,441.45.

carrier. Anything more than the amount of PSL's repair costs, which Federal Express paid prior to trial, cannot be recovered in a California court. As we explain, both of the grounds cited by Federal Express support its argument.

# I

■ The ADA enacted by Congress in 1978 largely deregulated air transport service within the United States. Congress determined that the quality and efficiency of air carrier service would be better promoted by relying on competitive market forces instead of the existing system of pervasive federal regulation. A major congressional concern was that carriers should not be burdened with conflicting state laws and policies that would have adverse economic consequences on the goal of increasing competition among carriers. (See 49 U.S.C. § 40101(a)(6); H.R. Conf. Rep. No. 95-1779, 2d Sess., 1, 53 (1978); *American Airlines, Inc. v. Wolens* (1995) 513 U.S. 219, 222, 228, 230 [130 L.Ed.2d 715, 115 S.Ct. 817]; *Morales v. Trans World Airlines, Inc.* (1992) 504 U.S. 374, 378–379 [119 L.Ed.2d 157, 112 S.Ct. 2031].) To avoid state frustration of its purposes, Congress included a provision preempting conflicting state law. In its current version, the provision reads in pertinent part: "A State . . . may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier . . . ." (49 U.S.C. § 41713(b)(1).) The United States Supreme Court has twice considered the scope of this provision.

In *Morales v. Trans World Airlines, Inc., supra,* 504 U.S. 374, the attorneys general of seven states notified airlines that they would enforce certain nonstatutory "guidelines" related to the content of the airlines' advertising concerning frequent flyer programs and overbooking. The court held the guidelines "related to" fares and were thus preempted. The court noted the wide and inclusive scope of the preemption provision; the statute was described as having an " 'expansive sweep' " granted by " 'broadly worded' " language that is " 'deliberately expansive' " and " 'conspicuous for its breadth.' " From this language the court concluded, "State enforcement actions having a connection with or reference to airline' 'rates, routes or services' are pre-empted" (*id.* at pp. 383–384) even if consistent with federal law. (*Id.* at pp. 386–387.) The court further concluded that the states threatened action against what it termed "fare advertising" related to the rates charged by the airlines and was therefore preempted. (*Id.* at pp. 387–391.)

In *American Airlines, Inc. v. Wolens, supra,* 513 U.S. 219, members of an air carrier's frequent flyer program brought suit in state court alleging that a change in the way the program was administered constituted a breach of contract, and violated an Illinois consumer fraud statute. Refusing to retreat

from the broadly inclusive reading given the preemption provision in *Morales*, the court held that preemption was not restricted to matters that were "essential" to airline operations. "Nonessential" matters were also preempted if they "relate[d] to" the objects of the preemption provision. (513 U.S. at p. 226.) The Illinois statute could not be employed because it was intended "to guide and police the marketing practices of the airlines," a matter "left largely to the airlines themselves, and not at all to States" by the ADA. (*Id.* at p. 228.)

The breach of contract part of the action, however, was not a "state-imposed obligation" and was thus not preempted. (*American Airlines, Inc. v. Wolens, supra*, 513 U.S. 219, 228–229.) Helpful to understanding what is and what is not prohibited to state involvement is the distinction between what the parties bargain for and what is externally imposed upon that bargain by a state. Terms, conditions, and remedies offered by the carrier and accepted by the customer qualify as "privately ordered obligations," and therefore are not enacted or enforced by the state. (*Id.* at pp. 228–229.) "A remedy confined to a contract's terms simply holds parties to their agreements . . . [and] business judgments . . . ." (*Id.* at p. 229.)

█ These considerations persuaded the United States Supreme Court to formulate the following rule—the preemption provision "permits state-law-based court adjudication of routine breach-of-contract claims" although it "stops States from imposing their own substantive standards with respect to rates, routes, or services, but not from affording relief to a party who claims and proves that an airline dishonored a term the airline itself stipulated. This distinction between what the State dictates and what the airline itself under-takes confines courts, in breach-of-contract actions, to the parties' bargain, with no enlargement or enhancement based on state laws or policies external to the agreement." (*American Airlines, Inc. v. Wolens, supra*, 513 U.S. 219, 232–233.) As one federal court held, "when the state begins to change the parties' financial arrangements . . . it is supplying external norms, a process that the national government has reserved to itself in the air transportation business." (*United Airlines, Inc. v. Mesa Airlines, Inc.* (7th Cir. 2000) 219 F.3d 605, 609–610.)

There is no dispute that Federal Express qualifies as an air carrier for purposes of this provision. (See 49 U.S.C. § 40102(a)(2); *Kemper Ins. Companies v. Federal Exp. Corp.* (1st Cir. 2001) 252 F.3d 509, 512, fn. 3; *Federal Exp. Corp. v. U.S. Postal Service* (W.D. Tenn. 1999) 55 F.Supp.2d 813, 817.) It is equally plain that PSL's lawsuit is about the service Federal Express provides to customers. The essence of that service is the transportation of freight by air. PSL's lawsuit is clearly founded on the unsatisfactory manner in which Federal Express performed that service. It is therefore

related to a service of an air carrier.[2] In addition, it is elemental economics that liability—actual and potential—will impact the rates Federal Express charges for its services.[3] (See *Federal Exp. v. California Public Utilities Com'n* (9th Cir. 1991) 936 F.2d 1075, 1077.) Imposing liability for performance of a carrier's core function would clearly impact the economic ability of that carrier to compete, and thus must be deemed " 'relating to a price . . . or service of an air carrier.' " (E.g., *Read-Rite Corp. v. Burlington Air Express, Ltd.* (9th Cir. 1999) 186 F.3d 1190, 1196–1197; *HIH Marine Ins. Services, Inc. v. Gateway Freight Services* (2002) 96 Cal.App.4th 486, 493–494 [116 Cal.Rptr.2d 893].)

The contract in this case was the airbill Federal Express issued to PSL. (E.g., *Zubaz, Inc. v. Federal Exp. Corp.* (W.D. Tenn. 1994) 864 F.Supp. 723, 725; *Commodities Recovery Corp. v. Emery Worldwide* (D. N.J. 1991) 756 F.Supp. 210, 212.)[4] At trial PSL was no longer pursuing a routine breach of contract action. Federal Express had already paid the compensatory damages for breach agreed upon by the parties in the contract of carriage. Instead, PSL was pursuing recovery of *"Brandt* damages," named after *Brandt v. Superior Court* (1985) 37 Cal.3d 813 [210 Cal.Rptr. 211, 693 P.2d 796]. Our Supreme Court recently explained the nature of *"Brandt* damages": "In *Brandt,* this court established a notable exception to [the] rule [i.e., that parties ordinarily pay their own attorney fees] for insurance bad faith cases. We explained that if an insurer fails to act fairly and in good faith when discharging its responsibilities concerning an insurance contract, such breach may result in tort liability for proximately caused damages. Those damages can include the insured's cost to hire an attorney to vindicate the insured's legal rights under the insurance policy. 'When an insurer's tortious conduct reasonably compels the insured to retain an attorney to obtain the benefits due under a policy, it follows that the insurer should be liable in a tort action for that expense. The attorney's fees are an economic loss-damages-proximately caused by the tort. [Citation.] These fees must be distinguished from recovery of attorney's fees *qua* attorney's fees . . . . What we consider here is attorney's fees that are

---

[2] Although federal courts have not adopted a uniform definition of what constitutes a carrier's "services" preempted from state interference, a majority of the circuits have given the term a broad construction in keeping with the Supreme Court's decisions in *Morales* and *Wolens.* (See decisions cited in Comment, *Federal Preemption of State Law Relating to an Air Carrier's Services* (2004) 71 U. Chi. L.Rev. 1197, 1202–1208.)

[3] As will be shown in part II, *post,* federal common law has long accepted limiting liability for lost, damaged, or destroyed cargo and personal property as intimately connected to the efficient operation and economic viability of common carriers.

[4] If the airbill incorporates by reference other materials, such as a shipper's service guide, they too are regarded as part of the contract. (E.g., *King Jewelry, Inc. v. Federal Exp. Corp.* (C.D. Cal. 2001) 166 F.Supp.2d 1280, 1284–1285, fn. 3; *Zubaz, Inc. v. Federal Exp. Corp., supra,* 864 F.Supp. 723, 725.) The Federal Express airbill does incorporate its service guide, but the guide did not figure at trial or in the parties' briefs.

recoverable as damages resulting from a tort in the same way that medical fees would be part of the damages in a personal injury action.' " (*Cassim v. Allstate Ins. Co., supra,* 33 Cal.4th 780, 806, quoting *Brandt v. Superior Court, supra,* at p. 817.) Federal Express claims that the jury awarded compensatory damages for bad faith, arguing that such damages are, notwithstanding federal preemption, beyond those permitted by *Brandt*. PSL contends that the jury awarded no more than attorney fees reasonably incurred in compelling Federal Express to provide the coverage it refused in bad faith.[5]

*Brandt* damages are not awarded in routine breach of contract actions. They are also the result of California common law, which qualifies as an "other provision having the force and effect of law" within the meaning of the preemption statute. (*United Airlines, Inc. v. Mesa Airlines, Inc., supra,* 219 F.3d 605, 607.) *Brandt* damages, or recovery of attorney fees, is not mentioned in the airbill agreement between PSL and Federal Express. This type of damages is thus not a part of the bargain struck by the parties. It must therefore be regarded as an "enlargement or enhancement based on state law or policies external to the agreement." (*American Airlines, Inc. v. Wolens, supra,* 513 U.S. 219, 233.) Moreover, *Brandt* damages are based on a bad faith refusal of an insurer to provide policy benefits, another creature of state common law. (E.g., *Freeman & Mills, Inc. v. Belcher Oil Co.* (1995) 11 Cal.4th 85, 91 [44 Cal.Rptr.2d 420, 900 P.2d 669] [" '[I]n California, the law implies in *every* contract a covenant of good faith and fair dealing' "]; *Mitchell v. Exhibition Foods, Inc.* (1986) 184 Cal.App.3d 1033, 1043 [229 Cal.Rptr. 535] [same]; *Spindle v. Travelers Ins. Companies* (1977) 66 Cal.App.3d 951, 959 [136 Cal.Rptr. 404] ["the evolvement of the doctrine of the implied covenant of good faith and fair dealing *is* an expression of *public policy* in our state"].) The covenant is also extracontractual; it "is implied as a supplement to the express contractual covenants . . . ." (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 36 [44 Cal.Rptr.2d 370, 900 P.2d 619].) Conditions implied by law are conditions imposed by law—state law; they are not negotiated by the contracting parties. Claims based on violation of the covenant are therefore preempted. (E.g., *Howell v. Alaska Airlines, Inc.* (Wn.Ct.App. 2000) 99 Wn.App. 646 [994 P.2d 901, 903–905]; *Osband v. United Airlines, Inc.* (Colo.Ct.App. 1998) 981 P.2d 616, 622 and decisions cited; *A.I.B. Express, Inc. v. FedEx Corp.* (S.D. N.Y. 2004) 358 F.Supp.2d 239, 253 [2004 WL 2526293 p. 8 (Nov. 8, 2004)].)

The same is also true for punitive damages. They were not part of the bargain struck by PSL and Federal Express. A creature of statute (Civ. Code,

---

[5] The parties have not cited, nor has our own research discovered, any reported decisions where *Brandt* damages have been allowed in any context other than insurance. The point is moot, however, in light of the fact that the judgment must be reversed because of federal preemption.

§ 3294), the purpose of punitive damages "is a purely *public* one. The public's goal is to punish wrongdoing and thereby to protect itself from future misconduct, either by the same defendant or other potential wrongdoers." (*Adams v. Murakami* (1991) 54 Cal.3d 105, 110 [284 Cal.Rptr. 318, 813 P.2d 1348].) "Such damages are *never* recoverable" in routine breach of contract cases. (1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 820, p. 739, italics added; accord, e.g., *Cates Construction, Inc. v. Talbot Partners* (1999) 21 Cal.4th 28, 61 [86 Cal.Rptr.2d 855, 980 P.2d 407] [" 'In the absence of an independent tort, punitive damages may not be awarded for breach of contract "even where the defendant's conduct in breaching the contract was wilful, fraudulent, or malicious" ' "]; *Tomaselli v. Transamerica Ins. Co.* (1994) 25 Cal.App.4th 1269, 1286 [31 Cal.Rptr.2d 433] ["simple breach of contract, no matter how willful and hence tortious, is not a ground for punitive damages"].) An award of punitive damages would therefore also constitute an " 'enlargement or enhancement [of the bargain] based on state laws or policies external to the agreement.' " (*Travel All Over the World, Inc. v. Saudi Arabia* (7th Cir. 1996) 73 F.3d 1423, 1432, fn. 8, quoting *American Airlines, Inc. v. Wolens, supra*, 513 U.S. 219, 233; accord, *Deerskin Trading Post, Inc. v. UPS of America, Inc.* (N.D. Ga. 1997) 972 F.Supp. 665, 673; see also *West v. Northwest Airlines, Inc.* (9th Cir. 1993) 995 F.2d 148, 152 ["Since punitive damages by their very nature seek to punish the entity against whom they are awarded, . . . such damages . . . would be contrary to the goals of deregulation."]; *Cleveland v. Beltman North American Co., Inc.* (2d Cir. 1994) 30 F.3d 373, 379 ["punitive damage awards could have a dramatic impact on a carrier's liability and seriously enlarge a shipper's remedy"].)

Nothing in the Ninth Circuit decision of *Charas v. Trans World Airlines, Inc.* (9th Cir. 1998) 160 F.3d 1259, or our decision in *Aquino v. Asiana Airlines, Inc.* (2002) 105 Cal.App.4th 1272 [130 Cal.Rptr.2d 223] compels a contrary conclusion. The former held only that "Congress did not intend to preempt passengers' run-of-the- mill personal injury claims" (*Charas v. Trans World Airlines, Inc., supra*, at p. 1261), whereas this case involves neither passengers nor run-of-the-mill tort claims, but what amounts to tort recovery for a breach of contract, something California allows only in the insurance context or when the breach is accompanied by an intentional tort that is independent of the contract. (*Robinson Helicopter Co., Inc. v. Dana Corp.* (2004) 34 Cal.4th 979, 989–990 [22 Cal.Rptr.3d 352, 102 P.3d 268].) *Aquino* likewise involved a passenger—not cargo—and primarily tort causes of action. A breach of contract claim was involved, but we held it could not be determined by summary judgment because there was an undecided question of federal—not state—law that might prohibit the carrier's action in refusing to board passengers for an intercontinental flight; "the [ADA] preempts *states* from imposing policies that affect an air carrier's prices, routes, or service.

There is no indication in the Act that *federal* policies are likewise preempted." (*Aquino v. Asiana Airlines, Inc., supra,* at pp. 1285–1286 & fn. 13.)

PSL maintains that the basis of its dispute with Federal Express is not with the actual transportation but with the subsequent conduct in handling PSL's repair reimbursement claim. The argument is tempting. But the law of federal preemption does not allow such a distinction. Preemption cases dealing with mail and highway carriers are illustrative of this principle. The Carmack Amendment to the Interstate Commerce Act (49 U.S.C. § 11707) governs liability for property transported by surface carriers. In language almost identical to that it used in *Wolens* to characterize the scope of the ADA's preemption provision, the United States Supreme Court held that the Carmack Amendment precludes augmentation by state remedies that " 'in anywise enlarge . . . the responsibility of the carrier' for loss or 'at all affect the ground of recovery, or the measure of recovery.' " (*Charleston & Car. R. R. v. Varnville Co.* (1915) 237 U.S. 597, 603 [59 L.Ed. 1137, 35 S.Ct. 715], quoting *Missouri, Kansas & Texas Ry. Co. v. Harris* (1914) 234 U.S. 412, 420, 422 [58 L.Ed. 1377, 34 S.Ct. 790].) It too has been construed to prevent law being used to " 'enlarge the responsibility of the carrier' " based on how the carrier handles claims for damage to the shipper's property. (*Charleston & Car. R. R. v. Varnville Co., supra,* at p. 603 [invalidating penalty under state statute for failure to pay claim within 40 days; "a state law is not to be declared a help because it attempts to go farther than Congress has seen fit to go"]; *Gordon v. United Van Lines, Inc.* (7th Cir. 1997) 130 F.3d 282, 289–290 ["the assertion of fraud in the claims handling process is preempted" because "the claims process is directly related to the loss or damage to the goods that were shipped. Indeed, people would not be involved in the process unless either loss or damage had occurred"]; *Rini v. United Van Lines, Inc.* (1st Cir. 1997) 104 F.3d 502, 506 ["Preempted state law claims . . . include all liability . . . stemming from the claims process, and liability related to the payment of claims."]; *Dictor v. David & Simon, Inc.* (2003) 106 Cal.App.4th 238, 247 [130 Cal.Rptr.2d 588]; *Nowakowski v. American Red Ball Transit* (Ill.App.Ct. 1997) 288 Ill.App.3d 348 [680 N.E.2d 441, 443, 223 Ill.Dec. 708]; cf. *Cleveland v. Beltman North American Co., Inc., supra,* 30 F.3d 373 [carrier guilty of "foot-dragging and stonewalling" shippers' claim for damaged property not liable for breach of *federal* common law duty of good faith and fair dealing; held, Carmack Amendment does not allow federal courts to add common law duties or remedies].) Given that the Carmack Amendment deals with a different aspect of the same subject as the ADA—interstate carriage of goods—and the striking similarity of the construction made by the Supreme Court, we cannot conclude that a different approach is warranted.

There is no logic to granting remedies if goods are shipped by air while denying them if they are shipped by rail or truck.[6]

However much PSL insists that it is not seeking to recover because of what happened to its equipment while in Federal Express's possession, the contract of carriage cannot be ignored. Without the contract, there would be no declared value coverage, no transportation of PSL's property, no damage, no claim and no delay in paying the claim. It does no violence to the English language to conclude that their contract is at the heart of the parties' dispute. Although PSL tries to reframe the issue as far away as possible from the actual movement of its goods, the fact remains that it all goes back to the contract. From this perspective, any judgment against Federal Express is liability for the performance of its services. (E.g., *Read-Rite Corp. v. Burlington Air Express, Ltd., supra,* 186 F.3d 1190, 1196–1197; *Gordon v. United Van Lines, Inc., supra,* 130 F.3d 282, 289–290.) It is also liability imposed and enlarged by California's "own substantive standards" concerning how those services should be performed. (See *American Airlines, Inc. v. Wolens, supra,* 513 U.S. 219, 232–233.) Even if the handling of claims could properly be characterized as "nonessential" to Federal Express's operations, it is "related to" those services, as it has "a connection with or reference to" those operations. (See *American Airlines, Inc. v. Wolens, supra,* at p. 228; *Morales v. Trans World Airlines, Inc., supra,* 504 U.S. 374, 384.) It is thus within the preemption of state remedies ordered by Congress.

## II

Even if there was no ADA preemption, there would be another insurmountable impediment to affirming the judgment. Preemption or no, the rule of decision to be applied would come from a doctrine of federal common law.

---

[6] There is recent evidence that Congress intends for air and surface shippers to be treated equally. In 1991 a circuit court held that Federal Express—whose operations combined air transport and motor vehicles—qualified as an air shipper for purposes of the ADA. The effect of this decision was that because Federal Express was covered by the ADA's preemption clause, its surface operations were exempted from state regulation. (*Federal Exp. v. California Public Utilities Com'n, supra,* 936 F.2d 1075.) This gave air shippers a competitive advantage over ground-based rivals who remained subject to state regulation. Congress responded with the Federal Aviation Administration Authorization Act of 1994, which, in addition to enacting the current version of the ADA preemption statute, used identical language in a preemption provision for land-based carriers: "Motor carriers of Property [¶] . . . . [A] State . . . may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier . . . ." (49 U.S.C. § 14501(c)(1).) It is exceedingly unlikely in light of this recent history that Congress intends to differentiate between air shippers and surface shippers. If both now share the same exemption, there is no reason to assume that Congress intends for surface shippers' protection under the Carmack Amendment to be greater than the protection given to air shippers by the ADA.

■ "Federal common law is truly federal law in the sense that, by virtue of the Supremacy Clause, it is binding on state courts" (19 Wright et al., Federal Practice & Procedure (2d ed. 1996) Federal Common Law, § 4514, p. 453, fn. omitted; *Banco Nacional de Cuba v. Sabbatino* (1964) 376 U.S. 398, 426 [11 L.Ed.2d 804, 84 S.Ct. 923]; *Wayne v. DHL Worldwide Express* (9th Cir. 2002) 294 F.3d 1179, 1184). Long before passage of the ADA, a doctrine of federal common law known as the "declared value" or "released value" doctrine limited a shipper's recovery for cargo or personal property that was lost, damaged, or destroyed while in the care of a carrier subject to federal regulatory jurisdiction.

■ A good statement of the doctrine may be found in *Kemper Ins. Companies v. Federal Exp. Corp.*, *supra*, 252 F.3d 509, 512: "Although traditional common law forbade a carrier from disclaiming liability for its own negligence [citation], the released value doctrine allows an air carrier to 'limit [its] liability for injury, loss, or destruction of baggage on a "released valuation" basis.' [Citations.] In exchange for a lower shipping rate, the shipper is deemed to have released the carrier from liability beyond a stated amount. [Citation.] However, the shipper is bound by this agreement only if (i) he has reasonable notice of the rate structure and (ii) he is given a fair opportunity to pay a higher rate in order to obtain greater protection." Once the carrier has complied with these requirements, its liability "cannot exceed the released value regardless of the degree of the carrier's negligence." (*Deiro v. American Airlines, Inc.* (9th 1987) 816 F.2d 1360, 1366.)

Originally formulated by federal courts as general common law under *Swift v. Tyson* (1842) 41 U.S. 1 [10 L.Ed. 865], the doctrine survived *Erie R. Co. v. Tompkins* (1938) 304 U.S. 64 [82 L.Ed. 1188, 58 S.Ct. 817], as part of the federal common law. Its application expanding with the scope of federal regulation, the doctrine applies to the states and to suits filed in state courts. (E.g., *New York, N. H. & H. R. Co. v. Nothnagle* (1953) 346 U.S. 128, 131–136 [97 L.Ed. 1500, 73 S.Ct. 986]; *Adams Express Co. v. Croninger* (1913) 226 U.S. 491, 505–506 [57 L.Ed. 314, 33 S.Ct. 148]; *Hart v. Pennsylvania Railroad Co.* (1884) 112 U.S. 331, 337–338 [28 L.Ed. 717, 5 S.Ct. 151]; *Read-Rite Corp. v. Burlington Air Express, Ltd.*, *supra*, 186 F.3d 1190, 1195–1196; Moore, The Law of Carriers (1906) Limitation of Liability, pp. 356, 360; Ray, Negligence of Imposed Duties, Carriers of Freight (1895) § 52, pp. 208–209.)

The ADA left in place a savings clause providing: "Nothing in this chapter shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this chapter are in addition to such remedies." (49 U.S.C. App., former § 1506 (Pub.L. No. 85-726 (Aug. 23, 1958) 72 Stat. 798), current version at 49 U.S.C. § 40120(c).) Courts have construed

this provision as permitting continued application of the released value doctrine to nonroutine breach of contract actions subsequent to the ADA and *Wolens*. (E.g., *Read-Rite Corp. v. Burlington Air Express, Ltd., supra,* 186 F.3d 1190, 1195–1197; *Sam L. Majors Jewelers v. ABX, Inc.* (5th Cir. 1997) 117 F.3d 922, 928–931; *First Pennsylvania Bank v. Eastern Airlines, Inc.* (3d Cir. 1984) 731 F.2d 1113, 1122; *King Jewelry, Inc. v. Federal Exp. Corp., supra,* 166 F.Supp.2d 1280, 1283; *Welliver v. Federal Exp. Corp.* (S.D. N.Y. 1990) 737 F.Supp. 205, 207.)[7]

PSL submits that it should not be bound by the declared value figure it and Federal Express fixed in the airbill. It reasons that "Were a carrier permitted to sell such [additional] coverage yet avoid the obligation to adjust claims in good faith and still limit its liability, the declared value doctrine would become a dead letter. . . . Stated otherwise, if FedEx were free to commit a bad faith breach of its obligations under its declared value coverage contract, it would effectively deny its customers a fair opportunity to obtain the benefits of coverage they thought they were purchasing." But that coverage, although long-delayed and grudgingly delivered, was not illusory. Because PSL did purchase additional "declared value" protection from Federal Express, and did ultimately receive its benefits, the liability limitation for the amount declared satisfies the released value doctrine. It is consequently valid and enforceable. (See *Read-Rite Corp. v. Burlington Air Express, Ltd., supra,* 186 F.3d 1190, 1198–1199.)

Confronting a situation almost identical to that endured by PSL, one federal appellate court stated: "Ordinarily, common law principles of equity leaven the law, softening its rigors so that the law's aim of administering justice fairly is not lost. But on occasion, and this is one, the equities urge a course that the law may not take." (*Cleveland v. Beltman North American Co., Inc., supra,* 30 F.3d 373, 374.) We find ourselves similarly hamstrung. Although the supremacy of federal law requires that Federal Express prevail, we cannot refrain from expressing our dismay at this result. However, the statutory command that states stay out of this field, as twice expansively construed by the United States Supreme Court, is unambiguous. So is the released value doctrine of federal common law that would in any event have to be applied and which would also absolve Federal Express from paying any more than the contractual amount it has already turned over to PSL.

---

[7] California courts applied the release value doctrine prior to passage of the ADA (*Donlon Bros. v. Southern Pacific Co.* (1907) 151 Cal. 763, 770–775 [91 P. 603]; *Michalitschke v. Wells, Fargo & Co.* (1897) 118 Cal. 683, 688–689 [50 P. 847]; *Muelder v. Western Greyhound Lines* (1970) 8 Cal.App.3d 319, 324–325 [87 Cal.Rptr. 297]; see Civ. Code, §§ 2176, 2178) and after (*Dictor v. David & Simon, Inc., supra,* 106 Cal.App.4th 238, 245–249; *HIH Marine Ins. Services, Inc. v. Gateway Freight Services, supra,* 96 Cal.App.4th 486, 492–494).

The judgment is reversed. The parties shall bear their respective costs of appeal.

Sepulveda, J., and Rivera, J., concurred.

A petition for a rehearing was denied April 22, 2005, and respondent's petition for review by the Supreme Court was denied July 27, 2005.